Merrimack
No. 84-549

## THE STATE OF NEW HAMPSHIRE

v.

## JEFFREY JONES

December 31, 1985

*Stephen E. Merrill*, attorney general (*Brian T. Tucker*, assistant attorney general, on the brief, and *Andrew L. Isaac*, assistant attorney general, orally), for the State.

*James E. Duggan*, appellate defender, of Concord, by brief and orally, for the defendant.

KING, C.J.  The defendant was found guilty of the crime of aggravated felonious sexual assault, RSA 632-A:2, in a jury-waived trial before the Superior Court (*Nadeau*, J.) and was sentenced to 7-1/2 to 15 years at the New Hampshire State Prison.

Prior to trial, the defendant moved to suppress all evidence seized by the police incident to his arrest on the ground that the police failed to comply with the "knock and announce rule." After a hearing, the court denied the motion. The defendant then filed a motion to reconsider in which he alleged that his arrest under a pre-existing bench warrant was improper since it was a pretext to question him regarding the sexual assault. The court also denied this motion. From the denial of these motions the defendant appeals, and we affirm.

On May 16, 1984, Deputy Police Chief David Mancini and other Pittsfield police officers were investigating a rape that had occurred earlier that day. Based upon the victim's description of her assailant, the police began to suspect the defendant. The victim told police that her assailant had informed her that he had to be in court later that morning on a DWI charge. The Pittsfield police checked with Concord District Court officials, who told the police that the defendant had been in court that morning on a DWI charge, but had just left. In reviewing their files, the police learned that a bench warrant

had been issued for the defendant's arrest eight months earlier, following his failure to pay a fine.

The police had been conducting interviews in the victim's neighborhood, seeking information about the rape. Believing that the defendant was still in Concord, the police decided to finish up the neighborhood interviews. Deputy Chief Mancini and another officer went to the home of the defendant's father, which was across the street from the victim's house, to question the elder Mr. Jones.

Deputy Chief Mancini later testified at the hearing on the motion to suppress, as follows, with respect to what happened next:

> "We returned to Broadway Street and started with the residences [sic] of Mr. Jones' father, I was aware he lived across the street from the victim's residence. We went to that building, I walked to the door, knocked on the door, the door is a single door with a large pane of glass in the top half. I received no response. As I was standing there waiting to get a response I looked through the doorway and could see a person laying on the couch, his face pointed toward me. I recognized it to be Mr. Jeffrey Jones. I again knocked on the door, this time considerably louder than the first time, and again received no response. The person on the couch, Mr. Jones, had not moved. I tried the door handle, it was open. Myself and the other officer entered the premises and placed Mr. Jones under arrest at that particular time, under the warrant issued by the Court [the pre-existing bench warrant]."

While they were arresting the defendant, the police saw a number of items on or near the couch that matched the victim's description of certain articles used by her assailant. The seizure of these items by the police is challenged by the defendant.

There has long been a rule at common law that an officer seeking to gain admission to a private dwelling in order to execute a warrant must first make his presence known, give his identity and purpose and ask for admission. If denied admission, the officer may then forcibly gain entrance. The rule was stated in an English case decided in 1604:

> "In all cases when the King . . . is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K[ing]'s process, if otherwise he cannot enter. But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors . . . ."

*Semayne's Case*, 5 Coke 91, 77 Eng. Rep. 194, 195 (1604). The rule is commonly referred to as the knock and announce rule. The reasons most often cited for the common law rule are the protection of an individual's right of privacy in his house, and the prevention of violence. *Sabbath v. United States*, 391 U.S. 585, 589 (1968).

The knock and announce rule has been widely adopted in the United States. The Congress of the United States codified the common law rule for federal law enforcement officials in 18 U.S.C. § 3109 (1985). Numerous States have also adopted the common law knock and announce rule either through case law, *e.g.*, *People v. Lujan*, 174 Colo. 554, 559, 484 P.2d 1238, 1241 (1971); *State v. Johnson*, 102 R.I. 344, 351–52, 230 A.2d 831, 835 (1967); or by statute, *e.g.*, DEERING'S CAL. PENAL CODE, § 1531 (1982); MICH. COMP. LAWS ANN. § 764.21 (1982).

This court has never before determined whether, under New Hampshire law, a police officer is required to knock and announce prior to entry into a residence. On two occasions we have addressed the question in *dicta*. In *State v. Smith*, 1 N.H. 346 (1818), we upheld a homeowner's conviction for resisting an officer and for assault where the officer, while attempting to serve criminal process, broke open the doors of the house after he demanded entry and was refused. In *Smith*, the court noted:

> "'For when a felony has been committed, or dangerous wound given, or even where a minister of justice comes armed with process founded on a breach of the peace, the party's own house is no sanctuary for him; but the doors may be forced after the notification, demand and refusal, after mentioned.'"

*Id.* at 347 (quoting 1 East C.L. 324 ch. 5, sec. 88). In *Gordon v. Clifford*, 28 N.H. 402, 415–16 (1854), we held that a tax collector could lawfully break open the outer door of a residence after he was refused entry, where the tax delinquent being sought had fraudulently taken up residence there to avoid the tax collectors.

■ Today, we hold that New Hampshire police officers, before forcibly entering a dwelling, should knock, identify themselves and their purpose, and demand admittance. This knock and announce rule will protect citizens' rights to privacy in their homes and prevent unnecessary violence which could result from unannounced entries.

The defendant has asked us to find that the New Hampshire knock and announce rule has its basis in the New Hampshire Constitution. Specifically, the defendant asks the court to hold that a

police violation of the rule renders a search or seizure unreasonable under part I, article 19 of the State Constitution. The defendant does not claim, on appeal, that the police failure to knock and announce violated the Federal Constitution.

When faced with the question whether violation of the Oregon knock and announce statute amounted to a violation of that State's constitution, the Oregon Supreme Court, in *State v. Valentine*, 264 Or. 54, 504 P.2d 84 (1972), *cert. denied*, 412 U.S. 948 (1973), held that a failure to announce presence and purpose does not make an otherwise lawful search and seizure unreasonable under the Oregon Constitution. The court reasoned that:

> "the interest of the momentary protection of the privacy of the householder and the interest in protecting innocent persons from the violence that may stem from an unannounced entry are not of sufficient substance to rise to constitutional stature and require the exclusion of otherwise competent evidence."

*Id.* at 66, 504 P.2d at 89.

Similarly, in *United States v. Nolan*, 718 F.2d 589 (3d Cir. 1983), the United States Court of Appeals for the Third Circuit considered the relationship of the federal knock and announce statute (18 U.S.C. § 3109) to the fourth amendment of the Federal Constitution, and noted:

> "While the purposes and origins of the knock and announce and of the fourth amendment requirements are similar, they are not identical, and the purposes of the latter properly should be more carefully guarded. The fourth amendment was originally fashioned to outlaw the use of general warrants and writs of assistance, which allowed agents of the government arbitrarily to conduct searches for evidence of wrongdoing, to the detriment of individual privacy; . . . The goal of curbing arbitrary government power to intrude at will into an individual's privacy differs from the goals of the knock and announce requirement, which addresses only the manner in which a legitimate and inevitable government intrusion into the target person's privacy is to take place. Such an intrusion, it is true, can be made in a way so violative of the privacy and property rights of the occupants of the dwelling as to be unreasonable within the meaning of the fourth amendment, *see Ker supra*, but not every violation of the statute will present such an unreasonable intrusion."

*Id.* at 602.

■■ We hold that our knock and announce rule has its basis in the common law rather than the New Hampshire Constitution, and that therefore, a violation of the knock and announce rule is not *per se* unconstitutional under part I, article 19 of the State Constitution. We do not foreclose the possibility that a failure to knock and announce may be so flagrant that it will influence whether a subsequent entry violates the State Constitution's prohibition against unreasonable searches and seizures. N.H. CONST. pt. I, art. 19. *See People v. Wolgemuth*, 69 Ill. 2d 154, 166, 370 N.E.2d 1067, 1072–73 (1977), *cert. denied*, 436 U.S. 908 (1978).

Generally, the knock and announce rule is given a broad, liberal application. In *Sabbath v. United States*, 391 U.S. 585, the United States Supreme Court, in considering the common law background to the federal knock and announce statute, stated that, "[t]he requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application." *Id.* at 589.

Although the knock and announce rule applies only to forcible entries, it is usually held that almost any force, however slight, triggers the requirement. *See Sears v. State*, 528 P.2d 732, 733 (Okla. Crim. App. 1974) (police forcibly entered where they pushed open a screen door that came unlatched when they knocked); *Nank v. State*, 406 So. 2d 1282 (Fla. Dist. Ct. App. 1981) (police forcibly entered where they opened an unlocked screen door). Most jurisdictions require an express announcement by police of their identity and purpose for demanding admission. In *Miller v. United States*, 357 U.S. 301 (1958), the court held that an officer's saying "police" was not a sufficient announcement of purpose. The Court there stated that, "A few more words by the officers would have satisfied the requirement in this case." *Id.* at 309–10. *See State v. Laponsie*, 136 Ariz. 73, 664 P.2d 223 (Ariz. App. 1982) (where police went through an open front door and simultaneously announced either "Tucson Police" or "police," they were held to have violated the Arizona "knock and announce" statute).

There are, however, several well-recognized exceptions to the rule. In *Miller supra*, the Court noted some State decisions that permit noncompliance with the knock and announce requirements where there are exigent circumstances, flight, or destruction of evidence, or if "the facts known to the officers would justify them in being virtually certain that the petitioner already knows their purpose so that an announcement would be a useless gesture." *Id.* at 310.

In the present case, the police officers' failure to announce their identity and purpose and to demand admittance, far from contribut-

ing toward making the subsequent entry unreasonable under the State Constitution, rightly falls under a "useless gesture" exception to the knock and announce rule.

The United States Court of Appeals for the District of Columbia Circuit in *Bosley v. United States*, 426 F.2d 1257 (D.C. Cir. 1970), has interpreted the federal knock and announce statute in a case involving facts similar to those of the present case. In *Bosley* the police went to the defendant's apartment to arrest him. An officer testified that:

> "'We knocked on the door. The door was a little bit ajar. We knocked on the door. No answer. We could look through and see someone laying on the couch. So we just pushed the door open and walked in.'"

*Id.* at 1259. The court in deciding that the police action was proper, ruled that:

> "Since appellant had not been awakened by their knocking, the officers could reasonably have concluded that further knocking or verbal announcement would be a 'useless gesture.'"

*Id.* at 1263 (footnote omitted). *Accord State v. Lohnes*, 344 N.W.2d 605, 612–13 (Minn. 1984).

In the present case, the police officers knocked on the door of defendant's father's house, saw defendant lying on the couch facing the door and apparently asleep, and then knocked again more loudly than the first time. Since this knocking still failed to rouse the sleeping defendant, it would have been a useless gesture for the officers to have made an announcement of their identity and purpose before opening the unlocked door, entering the house and placing the defendant under arrest.

The defendant also argues that the evidence seized incident to his arrest should be suppressed since the pre-existing bench warrant the police used to arrest him did not satisfy the arrest warrant requirements of the State and Federal Constitutions. The defendant contends that use of the bench warrant by the police was a pretext for arresting him for felonious sexual assault and for gathering evidence of that more serious charge. In this case, the defendant's argument has no merit.

We begin, as we must, by first making an independent analysis of the protections afforded under the New Hampshire Constitution, *State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), using decisions of the United States Supreme Court and other jurisdictions only as aids in our analysis, *see Michigan v. Long*, 103 S. Ct.

3469, 3476 (1983). Thereafter, we need address Federal constitutional issues only insofar as federal law would provide greater protection. *State v. Ball, supra* at 232, 471 A.2d at 351.

■■ A search conducted without a search warrant is *per se* unreasonable and invalid, unless it comes within one of the few recognized exceptions to the warrant requirement. *State v. Theodosopoulos,* 119 N.H. 573, 578, 409 A.2d 1134, 1137 (1979), *cert denied,* 446 U.S. 983 (1980); *Mincey v. Arizona,* 437 U.S. 385, 390 (1978); *see* N.H. CONST. pt. I, art. 19; U.S. CONST. amend. IV. One of the recognized exceptions is a search incident to a valid arrest. *State v. Lemire,* 121 N.H. 1, 6, 424 A.2d 1135, 1138 (1981); *State v. Maxfield,* 121 N.H. 103, 105, 427 A.2d 12, 14 (1981); *United States v. Edwards,* 415 U.S. 800, 802–03 (1974).

■ An arrest, to be valid, must meet the requirement for reasonable searches and seizures of part I, article 19 of the New Hampshire Constitution. *See State v. Tapply,* 124 N.H. 318, 326, 470 A.2d 900, 905 (1983). Absent exigent circumstances or consent, the police must obtain an arrest warrant to enter a suspect's home to arrest him in order for the arrest to pass State constitutional muster. *State v. Chaisson,* 125 N.H. 810, 817–18, 486 A.2d 297, 302–03 (1984) (citing *State v. Morse,* 125 N.H. 403, 409, 480 A.2d 183, 187 (1984) (decided under Federal constitutional law); and *Payton v. New York,* 445 U.S. 573, 576 (1980)); *see* N.H. CONST. pt. I, art. 19. As we have noted before, "*Payton* demands for persons . . . that their pre-planned seizure on private premises, without consent and without any exigency that precludes the delay required to obtain a warrant, be permitted only after a determination of probable cause by a detached, disinterested magistrate." *Chaisson, supra* at 818, 486 A.2d at 303 (quoting *Morse, supra* at 408, 480 A.2d at 187).

■ In the present case, the Superior Court (*Nadeau,* J.) ruled that "a bench warrant issued by the District Court Justice satisfies the warrant requirement under the New Hampshire and the United States Constitutions to permit entry into a person's residence to effect an arrest. Such a warrant carries with it all of the authority inherent in any other arrest warrant." We agree. New Hampshire courts are authorized by RSA 597:37 to issue bench warrants, and officers are bound by RSA 594:7 to execute the warrants issued.

Several courts have recognized that in some instances police may make an otherwise valid arrest for one offense as a pretext for arresting an individual for another, usually more serious, offense or for gaining evidence of the more serious charge. When such sham arrests are made, these courts suppress evidence seized incident to

the arrests. *See, e.g., United States v. Lefkowitz,* 285 U.S. 452, 465–67 (1932); *Amador-Gonzalez v. United States,* 391 F.2d 308, 315 (5th Cir. 1968); *Taglavore v. United States,* 291 F.2d 262 (9th cir. 1961); *United States v. Keller,* 499 F. Supp. 415, 416–17 (N.D. Ill. 1980).

In *Taglavore,* for example, the United States Court of Appeals for the Ninth Circuit suppressed evidence of a narcotics violation that was seized incident to an arrest on a traffic warrant. The court noted that "[w]here the arrest is only a sham or a front being used as an excuse for making a search, the arrest itself and the ensuing search are illegal." *Taglavore, supra* at 265.

In that case, a police inspector suspected the defendant of a narcotics violation. This same police official, claiming he saw the defendant commit a traffic violation the day before, swore out a warrant for the defendant's arrest on the traffic offense. The inspector then gave the traffic warrant to two subordinates, directing them to go out at once to find the defendant, and telling the pair that there was an excellent chance that the defendant would have marijuana cigarettes in his possession. During the course of the arrest on the traffic warrant, the defendant tried to destroy a marijuana cigarette by eating it. The two police officers were able to recover part of the marijuana cigarette from the defendant's mouth by choking the defendant until he opened his mouth. *Id.* at 264.

The present case clearly differs from *Taglavore* and other "sham" arrest cases in a number of important respects. The bench warrant for Jones was issued long before he became a suspect in the felonious sexual assault case. The officers investigating the sexual assault played no role in procuring the bench warrant on the lesser offense. The officers in this case did not go to the Jones house with the purpose of arresting Jeffrey Jones on the bench warrant. Rather, they went to the Jones house to question Jones's father about whether he knew anything about the sexual assault that had happened earlier that day across the street. It was only after the police were at the door of the Jones house to question the elder Mr. Jones that they saw Jeffrey Jones and, knowing a bench warrant for his arrest existed, arrested him. *See United States v. Miller,* 589 F.2d 1117, 1128–29 (1st Cir. 1978) (court noted that "[f]ounded suspicions that a person has committed one crime do not disable an officer from making a probable cause arrest based upon the operation of vehicle during guilty flight from the officer's reasonable attempts to question that person"). The court distinguished "the case of officers having mere suspicions who carefully lie in wait until a minor traffic infraction gives them a pretext to confirm their suspicions." *Id.* at 1128–29.

The facts in the present case are similar to those of *United States v. Bayko,* 774 F.2d 22 (1st Cir. 1985), where the United States

Court of Appeals for the First Circuit held that police did not violate defendant's right under the fourth amendment to be free from unreasonable searches and seizures. In that case, the policeman went to defendant's apartment to inform the occupant that a complaint had been made about the loudness of his television. The policeman knocked on defendant's door, but did not announce his identity. The defendant opened his door and pointed a gun at the officer. When he saw that the caller was a policeman the defendant threw the gun aside. The policeman, recognizing the defendant as a previously convicted felon, and knowing that in all likelihood he had no right to possess the gun, arrested the defendant and seized the gun. The First Circuit held that, "without deciding whether policemen can *always* knock on *any* door, we hold this knock lawful. *See* W. LaFave, Search and Seizure § 2.3(b), at 298 (1978) ('It is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business.')." *Bayko, supra* at 23 (emphasis in original).

▇▇▇▇ In this case, the arrest of Jeffrey Jones on the pre-existing bench warrant was not a sham or a pretext. The arrest was valid under part I, article 19 of the New Hampshire Constitution, and none of the evidence seized incident to it need be suppressed.

We need not consider the defendant's Federal constitutional claim that the arrest was invalid, since we find that the United States Constitution provides no greater protection than the New Hampshire Constitution in this area. *State v. Ball*, 124 N.H. at 232, 471 A.2d at 351.

*Affirmed.*

All concurred.