**Kathy ST. HILAIRE, Etc.,**
**Plaintiff, Appellant,**

v.

**CITY OF LACONIA, et al.,**
**Defendants, Appellees.**

**No. 95–1463.**

United States Court of Appeals,
First Circuit.

Heard Sept. 7, 1995.

Decided Dec. 1, 1995.

David H. Bownes, with whom A.G. O'Neil, Jr. and Normandin, Cheney & O'Neil were on brief, Laconia, N.H., for appellant.

Wayne C. Beyer, with whom Wayne C. Beyer and Associates, P.C. was on brief, Manchester, N.H., for appellees City of Laconia, Town of Belmont, David A. Gunter, David Nielsen, and Brian Loanes.

Donald J. Perrault, with whom Christine Desmarais–Gordon and Wadleigh, Starr, Peters, Dunn & Chiesa were on brief, Manchester, N.H., for appellees County of Belknap, Robert Dupuis, Jr., and Daniel Collis.

Before LYNCH, Circuit Judge, ALDRICH and CAMPBELL, Senior Circuit Judges.

LYNCH, Circuit Judge.

A tragic sequence of events leaving Philip St. Hilaire dead from wounds from a police bullet and leaving law enforcement officers and their municipal employers sued by his widow brings this case before us. The district court entered summary judgment against the widow's action under 42 U.S.C. § 1983, finding that the officers were protected by qualified immunity. Mrs. St. Hilaire appeals, saying there are genuine disputes of material fact and that the officers abrogated clearly established constitutional rights. We hold that while there are disputes of fact, those disputes are not material. We affirm because the defendants are entitled to qualified immunity in that they did not violate any constitutional law that was clearly established at the time of the shooting and they could reasonably have believed their search warrant was supported by probable cause.

## FACTS

Armed with some evidence (the sufficiency of which plaintiff challenges), Deputy Robert Dupuis of the Belknap County Sheriff's Office applied for a search warrant from the local district court to search both the person of Philip St. Hilaire and his place of business, Laconia Auto Wrecking. Based on information from a confidential informant, the police believed St. Hilaire was selling cocaine at Laconia Auto Wrecking and that he had just travelled to New York to "score" a load of cocaine. The warrant issued and the police planned their operation to execute the search warrant.

It was a joint operation between the Belknap Sheriff's Office, the Belknap Police and the Laconia Police. The participants—defendants Deputy Dupuis, Deputy Daniel Collis, Sgt. David Nielsen, Sgt. Brian Loanes, and Detective David Gunter—met in the early evening of April 27, 1990. The police believed St. Hilaire to be armed and possibly dangerous. They knew that St. Hilaire carried a .357 caliber revolver or a .25 caliber semi-automatic pistol, or both, and that he had a shotgun and a crossbow on the premises. They also had information that St. Hilaire had, a few days earlier, pointed a gun at the head of a person who had stooped to pick up St. Hilaire's dropped money bag. The police had also received complaints some time earlier about the sounds of shooting from the auto yard.

The police were concerned about the reflective glass on the front of Laconia Auto Wrecking, which made it difficult for people outside to see in but easy for people inside to see out. They felt it would be a danger to the police to approach the front of the building abruptly.

They decided that Deputy Dupuis and Sergeants Nielsen and Loanes would execute the search warrant. Detective Gunter, stationed across the street to help with surveillance, would then come in with his drug dog, Lux. Deputy Sheriff Collis was also stationed across the street, monitoring the auto yard, in radio communication with Dupuis. Sergeant Nielsen was in uniform; the remaining four defendant officers were in plain clothes. The search team waited at the rear of the building. Patrolmen in two marked cruisers were stationed on the road on either side of the business.

The plan was as follows. The team, led by Sgt. Nielsen would enter the building and then search St. Hilaire and the building. If the building was closed, the officers would find a way to enter or would wait for St. Hilaire to emerge and then reach him outside. They planned to identify themselves as law enforcement officers and state their purpose. Sergeant Nielsen was to lead because he was in uniform and St. Hilaire knew him from prior encounters. The officers thought

this would be the safest way to proceed. Detective Gunter testified that, in execution of a search warrant, the best policy is to make sure the subject understands that he is dealing with a police officer.

Things did not go according to plan. After watching someone else unsuccessfully trying to get in to the building, Collis concluded that the front door was likely locked and radioed so to Dupuis. Dupuis decided on more manpower and called Detective Gunter over to join the team waiting behind the building. Collis then saw St. Hilaire leave the building with his dog, lock up, and walk toward his car in the parking lot. Collis radioed this information to Dupuis.

The team, waiting behind the auto-wrecking building, decided to move in. Detective Gunter, who was closest to the parking lot, ran in front, ahead of the others. The police rounded the corner of the building and travelled the roughly 125 feet to the car in a period of seconds, hoping to reach St. Hilaire before he got into his car. It was not to be. St. Hilaire had already put his dog in the back seat, gotten into the driver's seat of his car and turned on the engine. Detective Gunter, who was dressed in jeans and a t-shirt, ran up to the car.

St. Hilaire, at that moment, looked up and saw a stranger dressed in jeans and a t-shirt, approach his open car passenger window, pointing a .357 magnum revolver toward him. St. Hilaire's eyes widened. St. Hilaire reached for his own gun, or so it appeared to Detective Gunter. Detective Gunter fired a bullet, hitting St. Hilaire in the neck. The bullet lodged in St. Hilaire's vertebra, paralyzing him from the neck down.

Sergeant Nielsen, in uniform, reached the car next. He saw that St. Hilaire's right hand was on top of a gun on the car seat. Sergeant Nielsen told St. Hilaire to let go of the gun. St. Hilaire replied that he could not, that he could not move. The police removed the gun.

St. Hilaire said to Sgt. Nielsen, "I didn't know you guys were the cops. Why didn't he identify himself? Why didn't he say he was a cop?" Later, at the hospital emergency room, St. Hilaire repeatedly told his nurse, "He didn't identify himself." St. Hilaire made the same statements to his wife.

The police testified, at deposition, that they did identify themselves. Detective Gunter testified that when he was halfway to the car he yelled, "Phil, police, Phil" and then, at the side of the car, he yelled "Hold it." He also testified, "I'm sure I yelled 'police,' but I don't remember." Sergeant Nielsen said that he heard Detective Gunter say, "Hold it Phil, police. Hold it, police," as Detective Gunter was about a foot away from the passenger side of the car. Deputy Dupuis said he was just behind Detective Gunter and heard Detective Gunter yell "Phil, police." Deputy Dupuis said he also yelled, "Police" as he rounded the building, some 58 feet from the car. Sergeant Loanes said he heard someone say something like "Police, freeze." Two other officers, who had been stationed across the street, heard someone yell, "Police." One of them, Collis, heard "Police" within two seconds of the gunshot. A passing motorist heard "Freeze," just before seeing the flash of a gun. Detective Gunter also said he had his police badge held in his extended left hand as he approached the car. Dupuis saw the badge in Detective Gunter's left hand immediately after the shooting.

Some currency and a bag containing three-fourths of an ounce of cocaine, worth about $2,200, were recovered from St. Hilaire's jacket. St. Hilaire died in October 1991 as a result of complications from his injuries. He was forty years old.

## LEGAL CLAIMS

Kathy St. Hilaire brought suit individually and as executrix of the estate under 42 U.S.C. § 1983 asserting that defendants had violated the Fourth Amendment. She also brought pendent state law claims for negligence and negligent and intentional infliction of emotional distress. Plaintiff's Fourth Amendment theories were that the search warrant was obtained without probable cause and that the defendants "used unreasonable force in executing a search warrant upon her husband in that they failed to identify themselves as police officers and then shot her husband when he failed to yield."

▮ The district court entered summary judgment based on qualified immunity. That decision is reviewed *de novo. Hegarty v. Somerset County,* 53 F.3d 1367, 1372 (1st Cir.1995) (citing *Jirau–Bernal v. Agrait,* 37 F.3d 1, 3 (1st Cir.1994)), *cert. denied,* —— U.S. ——, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995). All facts are reviewed in the light most favorable to the party opposing summary judgment. *Id.*

▮ The ultimate question of qualified immunity should ordinarily be decided by the court.[1] *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 536–37, 116 L.Ed.2d 589 (1991). In determining whether there is a qualified immunity defense "the court should ask whether the agents acted reasonably under settled law in the circumstances." *Id.* This court has identified two prongs to the basic qualified immunity analysis. *Hegarty,* 53 F.3d at 1373 (quoting *Burns v. Loranger,* 907 F.2d 233, 235–36 (1st Cir.1990)). First, the court must establish whether the constitutional right asserted by the plaintiff was "clearly established" at the time of the alleged violation. *Id.* Second, the court must ask whether "a reasonable official situated in the same circumstances should have understood that the challenged conduct violated

that established right." *Id.* (quoting *Burns,* 907 F.2d at 236).

▮ Whether the rights alleged are "clearly established" is a question of law for the court. *Elder v. Holloway,* —— U.S. ——, ——, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994). For purposes of determining qualified immunity, the officer's actions are measured by a standard of "objective legal reasonableness ... in light of the legal rules that were clearly established at the time [they] were taken."[2] *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (internal quotation omitted).

The Supreme Court, recognizing that the use of summary judgment in qualified immunity cases could be undermined, has held that a very broad articulation of the "clearly" established law at the time of the alleged violation is inappropriate:

[T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

Idaho 450, 464, 860 P.2d 653, 667 (1993); *see also Oliveira v. Mayer,* 23 F.3d 642, 649 (2d Cir.1994) (when material facts were disputed, issue of qualified immunity was for the jury), *cert. denied,* —— U.S. ——, 115 S.Ct. 721, 722, 130 L.Ed.2d 627 (1995); *Karnes v. Skrutski,* 62 F.3d 485, 491 (3d Cir.1995) (same); *Presley v. City of Benbrook,* 4 F.3d 405, 410 (5th Cir.1993) (if there remain disputed issues of material fact, jury, properly instructed, may decide issue of qualified immunity); *Brandenburg v. Cureton,* 882 F.2d 211, 216 (6th Cir.1989) (jury is final arbiter of qualified immunity when issue depends upon which version of the facts the jury finds).

1. While this court has not had the occasion to explore fully the allocation of functions between judge and jury where facts relevant to the immunity defense are in dispute, we have said that "we doubt the Supreme Court intended this dispute to be resolved from the bench by fiat." *Prokey v. Watkins,* 942 F.2d 67, 72 (1st Cir.1991). The ultimate question of whether a reasonable police officer, on the basis of information known to him, could have believed his actions were in accord with constitutional rights is "a question of law, subject to resolution by the judge not the jury." *Id.* at 73. But if there is a factual dispute, "that factual dispute must be resolved by a fact finder." *Id.* The precise question of whether the judge may intercede and play that fact finder role appears not to have been clearly decided by the Supreme Court. Some courts, consonant with the Seventh Amendment, have preserved the fact finding function of the jury through special interrogatories to the jury as to the disputes of fact, reserving the ultimate law question to the judge. *See King v. Macri,* 993 F.2d 294, 299 (2d Cir.1993); *Warren v. Dwyer,* 906 F.2d 70, 76 (2d Cir.), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990); *Lubcke v. Boise City/Ada Cty. Housing Auth.,* 124

2. This court has noted that, at least in police misconduct cases, the objective reasonableness standard for liability is most likely the same as that for a qualified immunity defense. *Roy v. Inhabitants of the City of Lewiston,* 42 F.3d 691, 694 (1st Cir.1994). *But see Oliveira,* 23 F.3d at 648–49 (maintaining that the two standards are distinct). In any event, we draw on the cases decided in the liability context for guidance in deciding the qualified immunity question. *See, e.g., Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

*Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. Without such a rule, the Court said, "[a] passably clever plaintiff would always be able to identify an abstract clearly established right that the defendant could be alleged to have violated," *id.* at 640 n. 2, 107 S.Ct. at 3039 n. 2, and so defeat summary judgment.[3]

The Court has also warned against requiring too great a specificity in the "clearly established law" such that the officer would be granted qualified immunity "unless the very action in question ha[d] previously been held unlawful." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. An earlier warning against exactly such a misapplication of the qualified immunity doctrine was given in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), a warning cited in *Anderson*. In *Mitchell* the court noted:

> We do not intend to suggest that an official is always immune from liability or suit for a warrantless search merely because the warrant requirement has never explicitly been held to apply to a search conducted in identical circumstances.

472 U.S. at 535 n. 12, 105 S.Ct. at 2820 n. 12. The proper characterization of the "clearly established law" is implicated in this case.

*The Shooting*

Plaintiff asserts two Fourth Amendment theories as to the shooting, both independent of her Fourth Amendment claim as to the warrant. Plaintiff argues that "[n]o reasonable law enforcement agent could believe that in executing a search warrant the law allowed him to surprise a suspect on a dead run, in plain clothes, with gun drawn at close range, and not provide that individual with adequate and reasonable notice of his identity and his lawful purpose." Plaintiff also argues that the facts of record "are sufficient to raise a material and genuine issue as to whether [Detective] Gunter had a reasonable belief he was acting in self defense." She claims that the "resolution of these issues is an inherently fact-based matter for the jury as no other officers observed the alleged conduct of St. Hilaire in reaching for the

weapon." The latter claim is, we believe, without merit. The first claim, that the police were required to identify themselves and their lawful purpose, however, raises difficult issues.

Plaintiff argues that summary judgment was improper because there were material facts in dispute. We agree that there is, on the record, a dispute of fact as to whether the police did identify themselves. St. Hilaire's first words, as he sat with a bullet hole in his neck, were to ask why the police had not identified themselves. He repeated this question at the hospital and told his nurses and his wife that the police did not identify themselves. While an inference can be drawn from the deposition testimony of the officers that St. Hilaire simply did not hear the identifications given by the police, another plausible inference could be drawn that the police did not identify themselves. A passing motorist who heard the police say "freeze" did not hear the word "police" mentioned, although the police testimony is that the two words were uttered together. Where "inferences to be drawn from the web of facts are disputed and unclear—and are likely to depend on credibility judgments," there is a dispute of fact. *Prokey v. Watkins*, 942 F.2d 67, 73 (1st Cir.1991).

The existence of a factual dispute does not end the inquiry. In summary judgment terms, the disputed fact must be material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In the context of a qualified immunity defense, the legal questions for the court to decide may well determine if the dispute is material. Here, the district court acknowledged that the plaintiff's argument raised "more troubling questions." The court also assumed, without deciding, that plaintiff had raised a genuine factual dispute as to whether defendants identified themselves as they approached St. Hilaire's vehicle. *St. Hilaire v. City of Laconia*, 885 F.Supp. 349, 357 n. 2 (D.N.H.1995).

---

**3.** Similarly, we note, a "passably clever" defendant might characterize the right involved in such broad terms as to say such a broad articulation could not permit a reasonable official to understand that what he is doing violates that right and so the right was not "clearly established."

The court nonetheless entered summary judgment for defendants, on the grounds that defendants did not violate any "clearly established" law. It reasoned that St. Hilaire's Fourth Amendment rights did not attach until the seizure actually occurred and that the shooting constituted the seizure. *Id.* at 357 n. 3. It reasoned that the issue before it was whether there was a clearly established obligation under the Fourth Amendment for police not unreasonably to create circumstances where the use of deadly force becomes necessary and if so, whether any such obligation was "clearly established." *Id.* at 356–57. It said there was no such clearly established obligation.

The district court analysis was reasoned and grounded on law from other Circuits. *See id.* at 357–58 (citing *Drewitt v. Pratt*, 999 F.2d 774, 780 (4th Cir.1993) (look only to whether it was reasonable for police officer to shoot in the circumstances as they existed at that moment); *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir.1993) ("we scrutinize only the seizure itself, not the events leading to the seizure"); *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir.1992) ("[P]re-seizure conduct is not subject to Fourth Amendment scrutiny.")). We believe that reasoning to be in error and to create some of the difficulties warned against in *Mitchell* and *Anderson*. We nonetheless affirm on the ground that the factual dispute as to whether the defendant officers identified themselves as they approached St. Hilaire is immaterial as a matter of law.

■ We first reject defendants' analysis that the police officers' actions need be examined for "reasonableness" under the Fourth Amendment only at the moment of the shooting. We believe that view is inconsistent with Supreme Court decisions and with the law of this Circuit. The Supreme Court in *Brower v. Inyo*, 489 U.S. 593, 109 S.Ct. 1378,

103 L.Ed.2d 628 (1989), held that once it has been established that a seizure has occurred, the court should examine the actions of the government officials leading up to the seizure.[4] The Court held that petitioners' decedent was "seized" when he crashed into a police roadblock set up in order to stop his flight. "We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* at 599, 109 S.Ct. at 1382. The Court remanded the cause for a determination of whether the seizure was "unreasonable" in light of petitioners' allegations that the roadblock had been set up in such a manner as to be likely to kill the decedent. *Id.; see also Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir.) ("[W]e carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage."), *cert. denied*, —— U.S. ——, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994).

This court has recently followed a similar approach. In *Hegarty*, this court examined each of the actions leading up to the mortal wounding of a woman whom police officers were attempting to arrest for recklessly endangering the safety of four campers. 53 F.3d 1367. Instead of focusing solely on whether the officer who shot Hegarty was acting in self-defense at the moment of the shooting (Hegarty had picked up a rifle and raised it in the direction of the officers and ignored their demands to drop it), the court examined all of the actions of the officers to determine whether there was probable cause to arrest Hegarty and whether there were exigent circumstances to allow a forcible, warrantless, nighttime entry into her dwelling. *Id.* at 1374–79. Similarly, in *Roy v. Lewiston*, this court examined all of the surrounding circumstances in determining whether the police acted reasonably: "Roy

---

4. The district court's citation of *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), is inapposite. The question before the Supreme Court in *Hodari* was whether the defendant, who discarded cocaine while being pursued by police, had been "seized" at the time he dropped the drugs, for the purpose of determining whether the drugs were the fruit of an illegal seizure. *Id.* at 623, 111 S.Ct. at 1549. Thus, the question was not whether the seizure

was *reasonable*, which requires an examination of the totality of the circumstances, but whether there had been a seizure at all. We do not read this case as forbidding courts from examining circumstances leading up to a seizure, *once it is established that there has been a seizure.* We understand *Hodari* to hold that the Fourth Amendment does not come into play *unless* there has been a seizure, not that it does not come into play *until* there has been a seizure.

was armed; he apparently tried to kick and strike at the officers; he disobeyed repeated instructions to put down the weapons; and the officers had other reasons ... for thinking him capable of assault." 42 F.3d at 695.

This focus on the moment of the shooting led the district court to conclude that the issue was whether there was any clearly established constitutional duty on the part of police to avoid creating situations which increased the risk of use of deadly force. The district court concluded there was no such generalized duty. *Cf. Carter v. Buscher*, 973 F.2d 1328, 1331–33 (7th Cir.1992) (reading *Brower* to mean that courts should consider reasonableness of seizure in totality of circumstances, but should not consider whether it was reasonable for the police to create the circumstances). But at the core of plaintiff's case is not the broad contention that the police have a duty to reduce the risk of violence. Such a contention itself creates a risk that the "duty" is so broadly defined that it gives inadequate notice of what would violate the duty and thus would fall back on whether those specific facts have occurred in the case law before. Plaintiff instead makes a narrower, more specific claim.

Plaintiff contends that in executing a search warrant, the Fourth Amendment's prohibition against "unreasonable searches" requires the police to identify themselves as police and state their purpose.[5] Plaintiff's theory is that if the police had properly identified themselves, St. Hilaire would have known they were police, would not have himself felt endangered when he saw a stranger approach with a gun in his hand, and that St. Hilaire would not have made a movement in the direction of his gun. It is that movement which led Detective Gunter to fire his own weapon. There is some additional support in the record for plaintiff's theory. St. Hilaire and the police had had prior dealings. In each, the police identified themselves and St. Hilaire did not threaten them.

It falls to the court to determine whether this right allegedly violated was "clearly established" at the time of the incident. "Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law." *Elder*, —— U.S. at ——, 114 S.Ct. at 1022.

Plaintiff relies on the Supreme Court's recent decision in *Wilson v. Arkansas*, —— U.S. ——, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), which held that the reasonableness of the search of a dwelling depended in part on whether law enforcement officers announced their presence and authority prior to entering, thus incorporating the common law "knock and announce" rule into the Fourth Amendment.

■ Assuming *arguendo* that the *Wilson* rule supports plaintiff's case,[6] plaintiff's argument succeeds only if *Wilson* merely restated what was already clearly established constitutional law at the time of the shooting in 1990. *See Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) (constitutional right to a pretermination or prompt

---

**5.** Plaintiff relies on *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), which held that the Fourth Amendment prohibits use of deadly force to prevent the escape of an apparently unarmed suspected felon unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. *Garner* indeed establishes that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Id.* at 6, 105 S.Ct. at 1698–99. But *Garner*, while helpful, did not resolve immunity issues in that case, nor does it do so here.

**6.** Fourth Amendment law in some contexts recognizes a distinction between a person's home and a person's car. For example, the Fourth Amendment permits a slightly broader search pursuant to the arrest of the occupant of a vehicle and some warrantless searches of vehicles are permitted even if there are not emergency circumstances. *See generally* 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 3.7 (1984). One explanation for the different protection of items found in vehicles is that "[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects.... It travels public thoroughfares where both its occupants and its contents are in plain view." *United States v. Chadwick*, 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977) (quoting *Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974)).

post-termination hearing was not yet clearly established at time of discharge and it availed plaintiff not that defendant state officials violated state administrative regulations requiring such hearing because § 1983 protects constitutional rights); *Elder*, —— U.S. at ——, 114 S.Ct. at 1023 ("[T]he clearly established right [must] be [a] federal right."); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396. Thus, in order for the plaintiff to prevail, the notice requirement must have been clearly rooted in the Fourth Amendment jurisprudence in 1990. Plaintiff's argument fails because at the time of the shooting the notice requirement was not clearly of constitutional dimension.

The Court in *Wilson* noted that it had "never squarely held that this [common law] principle [of announcement] is an element of the reasonableness inquiry under the Fourth Amendment." —— U.S. at ——, 115 S.Ct. at 1918. The Supreme Court granted certiorari in *Wilson* precisely in order to resolve a conflict among state courts as to whether the common-law notice requirement was a part of the reasonableness inquiry under the Fourth Amendment. *Id.* at ——, 115 S.Ct. at 1916. The Court noted that in California and Illinois, it had been so held, but in Massachusetts, it had been held merely a rule of common law, not constitutionally compelled. *Id.* at —— n. 1, 115 S.Ct. at 1916 n. 1. The highest court in New Hampshire had held only that there was a common law rule that "police officers, before forcibly entering a dwelling, should knock, identify themselves and their purpose, and demand admittance." *State v. Jones*, 127 N.H. 515, 503 A.2d 802, 805 (1985). The court in *Jones* further held that this rule "ha[d] its basis in the common law" but did not foreclose the possibility that a failure to knock and announce may be so flagrant that a subsequent entry could violate the state constitution's prohibition against unreasonable searches and seizures. *Id.* at 805–06. The issue of whether the search at issue violated the federal constitution was not before the New Hampshire court. *Id.* at 805. *Cf. Prokey*, 942 F.2d at 72 n. 5 (looking to Maine law definition of probable cause as to immunity question).

The First Circuit has not decided whether a search in violation of the "knock and announce" rule violated the Fourth Amendment, although it has considered alleged violations of the federal "knock and announce" statute applicable to federal officers, 18 U.S.C. § 3109. *See, e.g., United States v. One Parcel of Real Property*, 873 F.2d 7, 9 (1st Cir.), *cert. denied sub nom. Latraverse v. United States*, 493 U.S. 891, 110 S.Ct. 236, 107 L.Ed.2d 187 (1989); *United States v. DeLutis*, 722 F.2d 902, 908–09 (1st Cir.1983). Thus, the established law at the time of the shooting was that the notice requirement was embodied in New Hampshire's common law. It was not, though, clearly established in this Circuit as a constitutional requirement until *Wilson*. In a § 1983 action, plaintiffs must show the *constitutional* right involved was clearly established. *Davis*, 468 U.S. at 194, 104 S.Ct. at 3019. Accordingly, under *Harlow* the defendants are entitled to qualified immunity on this theory.

As to the plaintiff's theory that there were disputed facts as to whether Detective Gunter had a reasonable belief he was acting in self-defense when he shot St. Hilaire, we, like the district court, see no such dispute. *See* 885 F.Supp. at 356–57. The judgment Detective Gunter made in that split second was at the very least reasonable, and it is not the role of the court to second-guess the decision. *See, e.g., Hegarty*, 53 F.3d at 1377; *see also Hunter*, 502 U.S. at 229, 112 S.Ct. at 537; *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039–40.

*The Search Warrant*

■ Whether or not there was probable cause for the warrant, defendants are entitled to qualified immunity unless "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley v. Briggs*, 475 U.S. 335, 344–345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986).

The facts presented in the warrant application are not disputed. We are thus left with the question of whether defendants are entitled to qualified immunity as a matter of law. Fed.R.Civ.P. 56(c). Recognizing that the police may not obtain immunity by relying on the judgment of the judicial officer issuing

the warrant under *Malley*, the defendants argue that there were reasonable indicia of probable cause and their belief they had probable cause can not be called unreasonable. That is, indeed, what the undisputed record demonstrates. A confidential informant told Deputy Dupuis that St. Hilaire was selling cocaine from Laconia Auto Wrecking, which was owned and operated by St. Hilaire. Dupuis consulted with detectives at the Laconia and Belmont Police Departments who had worked with the confidential informant on prior occasions. These detectives told Dupuis that the informant had twice previously provided information that led to seizures of contraband and the arrests and convictions of several persons. The informant then met with Dupuis and Detective Gunter in order to make a controlled purchase at Laconia Auto Wrecking. The substance purchased tested positive for cocaine. A second controlled purchase was made; the substance obtained also tested positive for cocaine. The informant also told Dupuis that St. Hilaire was going to New York to "score" a load of cocaine. Airline records confirmed that St. Hilaire had made a reservation to fly to New York around the same time as the informant's report.

On these facts, we cannot say that the indicia of probable cause are so lacking as to render official belief in its existence unreasonable. *See Malley*, 475 U.S. at 344–45, 106 S.Ct. at 1097–98. Defendants are therefore entitled to qualified immunity with respect to plaintiff's claim for lack of probable cause to issue the warrant.

*Municipal Defendants*

Summary judgment in favor of the municipalities, the City of Laconia, the Town of Belmont and the County of Belknap, is affirmed because there is no evidence, even had plaintiff shown a deprivation of St. Hilaire's constitutional rights, that it was as a result of official action taken pursuant to a "custom or usage" of the municipality. *See Monell v. New York City Dep't. of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Other than this single incident, there is no evidence even proffered to show such a municipal "custom and usage." Evidence of a single incident is usually insufficient to establish a "custom or usage." *Mahan v. Plymouth County House of Corrections*, 64 F.3d 14, 16–17 (1st Cir. 1995).

*The judgment of the district court is affirmed. No costs are awarded.*