St. Hilaire v. Laconia                    CV-93-191-B    03/31/95 P
                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE


Kathy St. Hilaire

     v.                                    Civil Action No. 93-191-B

City of Laconia, et al.


                    **MEMORANDUM AND ORDER**

     Laconia Police Department Detective David Gunter shot and
killed Philip St. Hilaire while executing a search warrant.
St. Hilaire's wife, Kathy, has sued Gunter, the other officers
involved in executing the warrant, and their employers.  She
argues that the defendants violated her husband's Fourth
Amendment rights because:  the warrant authorizing the search was
not supported by probable cause; defendants omitted material
facts from the affidavit supporting the warrant application; and
defendants unreasonably used deadly force in executing the
warrant.  She also alleges that defendants are liable under
various state law theories.  Defendants have responded with
summary judgment motions contending that the individual
defendants are protected from suit on her federal claims by the
doctrine of qualified immunity.  They also argue that plaintiff

has failed to state a constitutional claim against the municipal defendants.  Finally, defendants ask me to decline  supplemental jurisdiction over plaintiff's state law claims.

## I. FACTS

On April 27, 1990, Belknap County Deputy Sheriff Robert Dupuis applied for a warrant to search Philip St. Hilaire and his business, Laconia Auto Wrecking, for cocaine, drug paraphernalia, and materials related to drug trafficking.  Dupuis provided an affidavit in support of the warrant application that included information from a confidential informant who allegedly told Dupuis that St. Hilaire was selling cocaine at Laconia Auto Wrecking.  Dupuis further alleged in his affidavit that:  the informant had purchased cocaine from Laconia Auto Wrecking on two occasions under police supervision within the last two weeks; Dupuis was able to partially corroborate the informant's claim that St. Hilaire was planning a trip to New York to purchase cocaine; and two of Dupuis' fellow officers had previously obtained reliable information from the informant.  Based on this information, a special justice of the Laconia District Court issued the warrant the same day.

2

After Dupuis obtained the warrant, he and other law enforcement personnel, including defendants Gunter, David Nielsen and Brian Loanes of the Belmont Police Department, and Daniel Collis of the Belknap County Sheriff's Office, met at the sheriff's office to plan the searches. The group decided that Nielsen, Loanes, and Dupuis would form a team to find and search St. Hilaire. Nielsen volunteered to wear his uniform and the others agreed that they would remain in plain clothes. Collis and Gunter were assigned to surveillance across the street from Laconia Auto Wrecking. All of the defendants were warned that St. Hilaire was likely to be armed.

The defendants planned to search St. Hilaire while he was at work. Accordingly, the search team agreed to meet in the parking lot of the nearby vocational-technical school and to walk through the woods to the rear of Laconia Auto Wrecking. They would then wait at the back corner of the building with Collis and Gunter watching the front to let them know if the building appeared to be open for business. They also planned to station patrolmen in marked cruisers on the road on either side of Laconia Auto Wrecking. If surveillance reported that the building appeared to be open, the search team would come to the front of the building, enter with Nielsen in uniform leading, and confront St. Hilaire

3

inside the building.  If the building was closed for business, they would either try to break in or wait for St. Hilaire to leave the building and apprehend him in the yard.

At first, all went according to plan.  The cruisers and surveillance were in place.  The search team assembled in the parking lot and then walked to the rear of the building.  When they learned from surveillance that the building appeared to be locked, Dupuis called Gunter at his position in the parking lot across the street and instructed him to join the search team. While they were waiting for tools and making plans to break in, Collis radioed that St. Hilaire was leaving the building.  The group then immediately ran to the front of the building and saw that St. Hilaire was sitting in the driver's seat of his car with his back to the approaching officers.

Instead of approaching St. Hilaire in a group with Nielsen in uniform leading as planned, the officers ran toward the car from behind, with their weapons drawn, in single file separated by ten to fifteen feet.  Gunter, in plain clothes, was in the lead, followed by Dupuis, Nielsen, and Loanes.  The officers contend that they shouted a series of orders to St. Hilaire with some variation in their accounts.  Gunter states that he said "Phil, Phil, police" as he approached the rear of the car, and

4

that he thought he may have yelled, "Hold it" or "Police," when he arrived at the passenger door.  Nielson reports that he heard Gunter yell, "Hold it Phil, police, hold it," as Gunter approached the passenger side of the car and that no one else said anything.  Dupuis claims that he yelled, "Police," once or twice as he came around the corner of the building but stopped because other people were yelling.  Loanes states that he did not shout anything, but he heard others say, "Police freeze," or "Phil, its the police," or "Freeze, its the police."  Collis states that he heard yelling from one officer, he did not know who, including the word "Police."  Finally, a motorist passing the building at the time reported that he heard a shout of "Freeze" just before seeing the flash of a gunshot.

Gunter ran to the passenger side of the car with his gun in his right hand.  When Gunter reached the car, St. Hilaire turned and made eye contact with him.  At the same time, Gunter saw St. Hilaire's right shoulder move and later claimed that he thought that St. Hilaire was reaching for his gun.  Gunter then shot St. Hilaire through the partially open passenger window.

Nielsen opened the driver-side door and found St. Hilaire slumped in the seat with a critical throat wound.  St. Hilaire's gun was found next to him on the seat of his car.  Nielsen

5

reports that St. Hilaire asked him, "Why didn't he identify himself, why didn't he say he was a cop," and others state that St. Hilaire repeated the same questions at the hospital. As a result of the gunshot wound, St. Hilaire was paralyzed from his neck down. He died from complications caused by his injuries approximately eighteen months after the shooting.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994). A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); accord Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). A "material issue" is one that "might affect the outcome of the suit" under the applicable legal standard. Anderson, 477 U.S. at 248. The

6

burden is upon the moving party to show the lack of a genuine, material factual issue. <u>Finn v. Consolidated Rail Corp</u>., 782 F.2d 13, 15 (1st Cir. 1986). When a motion for summary judgment is properly supported, the burden shifts to the nonmovant to show that a genuine issue exists. <u>Donovan v. Agnew</u>, 712 F.2d 1509, 1516 (1st Cir. 1983). If the nonmovant fails to offer sufficient factual support to counter the movant's proffer on an element for which the nonmovant bears the burden of proof at trial, all other factual issues become immaterial, and the movant is entitled to summary judgment. <u>Smith v. Stratus Computer, Inc.</u>, 40 F.3d 11, 12 (1st Cir. 1994), <u>petition for cert. filed</u>, (Feb. 21, 1995).

## III. <u>DISCUSSION</u>

The primary issue presented by defendants' summary judgment motions is whether the individual defendants are entitled to qualified immunity with respect to plaintiff's constitutional claims. Thus, I begin by describing the law governing qualified immunity claims and then consider its application to plaintiff's specific claims that the individual defendants violated St. Hilaire's Fourth Amendment rights. I then turn to defendants' challenges to plaintiff's remaining claims.

## A. Qualified Immunity for Constitutional Claims Against the Individual Defendants

In <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982), the Supreme Court recognized that public officials performing discretionary functions are entitled to qualified immunity from suit for violations of federal law "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." A "necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991). Thus, a court may determine that a defendant is entitled to qualified immunity if either the plaintiff fails to properly assert and support a claim based on the violation of a constitutional right, or the court concludes that the law on which plaintiff's claim was based was not clearly established when the defendants acted. <u>Id.</u>, see also <u>Febus-Rodriguez v. Betancourt-Lebron</u>, 14 F.3d 87, 91 (1st Cir. 1994) (holding that as a predicate to the qualified immunity inquiry, "a plaintiff must establish that a particular defendant violated the

8

plaintiff's federally protected rights.").

The resolution of a qualified immunity defense presents a legal question for the court. Elder v. Holloway, 114 S.Ct. 1019, 1023 (1994); Whiting v. Kirk, 960 F.2d 248, 250 (1st Cir. 1992). Moreover, since the immunity is an immunity from suit rather than merely a defense to liability, it is imperative that such claims be resolved at the earliest possible date after suit is commenced. Siegert, 500 U.S. at 232-33. Thus, I will determine defendants' entitlement to immunity on their motions for summary judgment unless factual disputes material to the issue require resolution by the jury before I can resolve the legal questions their motions present. See Prokey v. Watkins, 942 F.2d 67, 73 (1st Cir. 1991).

## 1. Probable Cause

Plaintiff first claims that she is entitled to damages because the defendants lacked probable cause to seize St. Hilaire. Probable cause to issue a warrant exists if the totality of the circumstances related in the affidavit, viewed with common-sense, presents a fair probability that the proposed search will find contraband or evidence of a crime. United States v. Jordan, 999 F.2d 11, 13 (1st Cir. 1993) (citing

9

Illinois v. Gates, 462 U.S. 213, 238 (1983)).  Under the totality of the circumstances test, the value of a confidential informant's information is evaluated in light of all the indicia of its reliability, and a deficiency in one area may be compensated by the strength of other relevant factors.  United States v. Diallo, 29 F.3d 23, 25 (1st Cir. 1994) (citing Gates, 462 U.S. at 232-33).

The affidavit that Dupuis submitted in support of the search warrant application alleges that: (1) St. Hilaire owned Laconia Auto Wrecking; (2) an informant, whose established record of providing reliable information was detailed in the affidavit, reported that St. Hilaire was selling cocaine at his place of business; (3) the informant, acting under police supervision, subsequently purchased cocaine at St. Hilaire's business on two occasions in the weeks prior to the seizure; (4) the informant told the defendants that St. Hilaire was planning a trip to New York to purchase cocaine; and (5) airline records confirmed that St. Hilaire had made a reservation around the same time as the informant's report on a flight to New York's LaGuardia Airport.

These allegations sufficiently demonstrate the informant's reliability and corroborate his claim that St. Hilaire was engaged in the business of selling cocaine to support the issuing

10

judge's probable cause finding even though the affidavit does not expressly allege that the informant purchased cocaine directly from St. Hilaire. See Gates, 462 U.S. at 230; see also Jordan, 999 F.2d at 13-14. Accordingly, because plaintiffs have not shown that the search warrant lacked probable cause, defendants are entitled to immunity with respect to plaintiff's probable cause claim.

### 2. Material Omissions

Plaintiff next argues that St. Hilaire's seizure was unlawful because Dupuis failed to disclose in his affidavit that his informant was induced to provide information against St. Hilaire through offers of unspecified "consideration" with respect to several outstanding felony charges. The Supreme Court has recognized that a police officer's reckless or intentional misstatements of material fact in a search warrant affidavit violate the Fourth Amendment. Franks v. Delaware, 438 U.S. 154 (1978). This rule has been extended by various courts of appeal to include an affiant's intentional or reckless omission of material facts. See United States v. Higgins, 995 F.2d 1, 4 (1st Cir. 1993); United States v. Knapp, 1 F.3d 1026, 1029 (10th Cir. 1993); United States v. Travis, 993 F.2d 1316, 1320 (8th Cir.), cert. denied, 114 S. Ct. 229, 245 (1993). When plaintiff claims

11

a Fourth Amendment violation based on alleged omissions of material facts from a warrant application, the merit of the claim depends on "'whether, even had the omitted statements been included in the affidavit, there was still probable cause to issue the warrant.'" Higgins, 995 F.2d at 4 (quoting United States v. Rumney, 867 F.2d 714, 720-21 (1st Cir.), cert. denied, 491 U.S. 908 (1989)).

Even if Dupuis's affidavit had been corrected to include the "consideration" the police offered the informant, it still would have demonstrated probable cause to justify the search because the affidavit contained enough corroboration and sufficient evidence of the informant's past reliability to establish the probable accuracy of the informant's information. Thus, plaintiff has failed to properly support her material omissions claim, and therefore, defendants are entitled to immunity with respect to this claim.

### 3. Excessive Force

Plaintiff's final claim is that defendants used unconstitutionally excessive force in executing the warrant.

#### a. Fourth Amendment Reasonableness and Qualified Immunity

Excessive force claims arising during the course of a police

12

search or seizure must be analyzed under the Fourth Amendment's reasonableness clause.  Graham v. Connor, 490 U.S. 386, 395 (1989).[1]  Precedent dictates that the reasonableness of searches and seizures must be evaluated by considering whether the officer's conduct was objectively reasonable when judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id. at 396.  Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."  Id. at 397.  Ultimately, the reasonableness of an officer's use of force will be determined by "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Id. at 396 (quotations omitted).

Because a determination of both liability for and immunity

---

[1]    Plaintiff alleged in her complaint that defendants' use of deadly force also violated St. Hilaire's right to substantive due process.  However, in light of Graham, plaintiff has abandoned this cause of action.

13

from claims based on violations of the Fourth Amendment's reasonableness clause require an inquiry into the objective reasonableness of a defendant's conduct, some courts in other circuits appear to suggest that the same test should be used to evaluate both the substantive claim and the immunity defense. See Wardlaw v. Pickett, 1 F.3d 1297, 1303 (D.C. Cir. 1993), cert. denied, 114 S. Ct. 2672 (1994); Hopkins v. Andaya, 958 F.2d 881, 885 n.3 (9th Cir. 1992); Jackson v. Hoylman, 933 F.2d 401, 402-03 (6th Cir. 1991); Street v. Parham, 929 F.2d 537, 540-41 n.2 (10th Cir. 1991). Following a similar approach, the First Circuit in Roy v. Inhabitants of Lewiston, 42 F.3d 691 (1st Cir. 1994), held that the defendants were entitled to immunity from plaintiff's excessive force claim, but observed that because the substantive standard and the immunity standard in such cases turns on whether the officer's conduct was objectively reasonable, the outcome probably would have been the same even if the officers had not raised an immunity defense. Id. at 695.

While these cases might be read to suggest that a defendant in an excessive force case can never claim immunity if the plaintiff pleads and properly supports a claim that defendants unreasonably used excessive force, that interpretation is plainly inconsistent with Supreme Court precedent. In Anderson v.

14

Creighton, 483 U.S. 635 (1987), the Supreme Court held that a police officer is immune from suit for an alleged violation of the Fourth Amendment's reasonableness clause if his conduct was objectively reasonable when "assessed in light of the legal rules that were 'clearly established' at the time it was taken." Id. at 639 (citation omitted). The dissent contended that the majority's formulation was incorrect because it would improperly entitle a defendant to immunity even if he reasonably, but mistakenly, concluded that his conduct was objectively reasonable. Id. at 648 (Stevens, J., dissenting) (contending that the majority improperly adopted "a double standard of reasonableness - the constitutional standard already embodied in the Fourth Amendment and an even more generous standard that protects any officer who reasonably could have believed that his conduct was constitutionally reasonable."). The majority countered by noting that in past applications of the doctrine of qualified immunity, the Court had afforded immunity protection to officers who had allegedly violated the Fourth Amendment. In addition, the majority explained that the confusion caused by using the terms "reasonable" and "unreasonable" to describe both immune conduct and Fourth Amendment violations did not preclude using a different "reasonable" standard for evaluating the

15

immunity defense. Id. at 643.

Anderson thus requires that a court consider two factors in evaluating an immunity defense to a claim based upon the Fourth Amendment's reasonableness clause: (1) whether a constitutional violation occurred at all; and (2) "'whether a reasonable [officer] could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct.'" Febus-Rodriguez, 14 F.3d at 91 (quoting McBride v. Taylor, 924 F.2d 386, 389 (1st Cir. 1991)). Accord Jones by Jones v. Webb, 45 F.3d 178, 183 (7th Cir. 1995) (holding that qualified immunity defenses to excessive force claims must be analyzed by asking "whether a reasonable officer could have believed that his conduct was constitutional in light of the clearly established law and the information the officer possessed at the time the incident occurred." (quotations and citations omitted)). Accordingly, an officer is entitled to claim qualified immunity in a police misconduct case even if he acted unreasonably unless the law under which the officer's conduct is deemed unreasonable was clearly established when he acted.

16

### b. Application

In <u>Tennessee v. Garner</u>, 471 U.S. 1, 11 (1985), the Supreme Court stated that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." <u>See also</u> <u>Reese v. Anderson</u>, 926 F.2d 494, 501 (5th Cir. 1991); <u>Smith v. Freland</u>, 954 F.2d 343, 347 (6th Cir.), <u>cert. denied</u>, 112 S. Ct. 1954 (1992). Relying on this principle, defendants argue that they are entitled to qualified immunity because the undisputed facts establish that when Gunter shot St. Hilaire, he reasonably believed that St. Hilaire was about to use deadly force against him. Plaintiff offers two arguments to support her claim that defendants are not entitled to summary judgment on this issue. First, she argues that a genuine factual dispute exists as to whether Gunter reasonably needed to use deadly force against St. Hilaire to protect himself. Second, she contends that even if Gunter acted in self-defense, defendants violated the Fourth Amendment by attempting to execute the warrant in a way that unreasonably increased the likelihood that they would have to use deadly force.

Plaintiff's first argument is easily addressed. While witnesses to the shooting disagree about minor details, no one disagrees that: (1) St. Hilaire was known to carry a weapon; (2) St. Hilaire's gun was found on the seat beside him after the shooting; and (3) the record contains no direct evidence to contradict Gunter's testimony that he shot St. Hilaire only after he reached for his weapon. Plaintiff's assertions that St. Hilaire lacked sufficient time to draw his weapon and that the position of his body when he was shot demonstrates that he could not have been reaching for his gun amount to little more than speculation. As such, they are insufficient by themselves to create a genuine dispute as to whether Gunter reasonably believed he had to use deadly force against St. Hilaire to defend himself.

Plaintiff's second argument raises more troubling questions. Although she points to several alleged deficiencies in the way in which defendants planned and executed St. Hilaire's seizure, plaintiff's most potent claim is that defendants unreasonably increased the likelihood that they would need to use deadly force by approaching St. Hilaire in plain clothes, with their guns

drawn and without identifying themselves as police officers.[2]
Had they properly identified themselves, plaintiff argues, St.
Hilaire would have offered no resistance. Moreover, she contends
that defendants' failure to identify themselves was unreasonable
because they could easily and safely have done so without
impairing their ability to subdue and search St. Hilaire.[3]

There is some support for the proposition that a police
officer who resorts to deadly force in self defense violates the
Fourth Amendment if he unreasonably creates the circumstances
where the use of deadly force becomes necessary. See, e.g.,

---

[2] Defendants have produced substantial evidence to counter
plaintiff's claim. However, I assume, without deciding, that
plaintiff has produced enough factual support for her claim to
raise a genuine factual dispute as to whether defendants
identified themselves as police officers when they approached St.
Hilaire's vehicle.

[3] It is well established that a person's Fourth Amendment
rights are not implicated until a seizure actually occurs.
California v. Hodari D., 499 U.S. 621, 629 (1991); Brower v.
County of Inyo, 489 U.S. 593, 596 (1989). Accordingly, plaintiff
does not contend that St. Hilaire's Fourth Amendment rights
attached as soon as defendants drew their guns and approached his
vehicle. Instead, she argues that St. Hilaire was "seized" when
he was shot and, irrespective of whether Gunter was justified in
using deadly force to defend himself at the moment of the
shooting, the seizure violated St. Hilaire's Fourth Amendment
rights because defendants' unreasonable conduct prior to the
shooting increased the risk that one of them would have to use
deadly force to subdue St. Hilaire.

19

Estate of Starks v. Enyart, 5 F.3d 230, 234 (7th Cir. 1993) (if officer deliberately stepped in front of a moving vehicle, he may not invoke self defense as a defense to a damages claim for shooting the vehicle's driver); Gilmere v. Atlanta, 774 F.2d 1495, 1501 (11th Cir. 1985) (en banc) (officer cannot claim immunity from a deadly force claim by arguing self defense if the officer created the circumstances where it became necessary to use deadly force in self defense), cert. denied, 476 U.S. 1115, 1124 (1986). However, neither the Supreme Court nor the First Circuit Court of Appeals[4] has yet taken such a position, and there is substantial authority elsewhere to support the contrary proposition.

---

[4] Although the First Circuit held prior to Graham that police officers who use deadly force against people who pose no danger to the officers or others without first providing a warning violate the victims' rights to substantive due process, Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553 (1st Cir. 1989), Gunter's reasonable belief that St. Hilaire was about to shoot him distinguishes this case from Gutierrez-Rodriguez. Also, although the Supreme Court held in Garner that the Constitution requires police to provide a warning, if feasible, before using deadly force when a dangerous suspect flees or threatens them or others, Garner, 471 U.S. at 11-12, no warning was feasible in the split-second between when Gunter believed St. Hilaire was about to shoot him and he acted in self defense. Thus, neither Gutierrez nor Garner provide clearly established law applicable to the circumstances in this case.

20

In dissenting from the denial of certiorari in one of the few cases supporting plaintiff's argument, then Chief Justice Burger stated that the court should have granted certiorari to reverse the decision because "an officer's conduct which makes the need for deadly force more likely does not constitutionally disable the officer from later using deadly force to defend himself." Sampson v. Gilmere, 476 U.S. 1124, 1125 (1986). Further, in Drewitt v. Pratt, 999 F.2d 774 (4th Cir. 1993), the Fourth Circuit Court of Appeals expressly rejected a claim that an officer who resorts to deadly force in self defense nevertheless violates the Fourth Amendment if he unreasonably provokes the shooting by failing to properly identify himself as a police officer. Id. at 778-789. Other circuits have reached similar conclusions. See, e.g., Carter v. Buscher, 973 F.2d 1328, 1332-33 (7th Cir. 1992); Cole v. Bone, 993 F.2d 1328, 1232-33 (8th Cir. 1993).

Given these conflicting precedents, the law concerning whether a police officer who legitimately uses deadly force in self-defense nevertheless violates the Fourth Amendment by unreasonably increasing the likelihood that deadly force will become necessary was not clearly established when the defendants acted. See Sullivan v. Horta, 4 F.3d 2, 13 (1st Cir. 1993).

21

Accordingly, the defendants are entitled to prevail on their qualified immunity defense.

### B.    Municipal Defendants

Plaintiff alleges that the Town of Belmont, the City of Laconia, and Belknap County are "jointly and severally liable" on her federal claims with the individual defendants.   However, these claims allege solely a respondeat superior theory which is not cognizable under § 1983.   See Monell v. Department of Social Servs., 436 U.S. 658, 695 (1978); Manarite v. Springfield, 957 F.2d 953, 958 (1st Cir.), cert. denied, 113 S.Ct. 113 (1992). These claims are dismissed.

### C.    Pendent State Claims

Having dismissed plaintiff's federal claims, I decline to retain supplemental jurisdiction over her remaining state law claims.   See 28 U.S.C.A. § 1367(c)(3).   Accordingly, I dismiss these claims without prejudice.

### IV. CONCLUSION

For the foregoing reasons defendants' motions for summary judgment (documents 16 and 19) are granted as to all of

plaintiff's federal claims.  Plaintiff's state law claims are dismissed without prejudice.

SO ORDERED.


_____
Paul Barbadoro
United States District Judge

March 31, 1995

cc:  Donald Perreault, Esq.
     Wayne Beyer, Esq.
     A. Gerard O'Neil, Esq.
     David Bownes, Esq.