December 22, 1995
United States Court of Appeals
For the First Circuit


No. 95-1463

KATHY ST. HILAIRE, ETC.

Plaintiff, Appellant,

v.

CITY OF LACONIA, ET AL.

Defendants, Appellees.



ERRATA SHEET ERRATA SHEET

The opinion of this Court issued on December 1, 1995, is amended
as follows:

On page 22, the first paragraph should be deleted and the
following paragraph inserted in its place:

Summary judgment in favor of the municipalities, the City of
Laconia, the Town of Belmont and the County of Belknap, is affirmed
because there is no evidence, even had plaintiff shown a deprivation
of St. Hilaire's constitutional rights, that it was as a result of
official action taken pursuant to a "custom or usage" of the
municipality. See Monell v. New York City Dep't. of Social Servs. 436 
U.S. 658, 691 (1978). Other than this single incident, there is no
evidence even proffered to show such a municipal "custom and usage."
Evidence of a single incident is usually insufficient to establish a
"custom or usage." Mahan v. Plymouth County House of Corrections, 64 
F.3d 14, 16-17 (1st Cir. 1995).

United States Court of Appeals
For the First Circuit


No. 95-1463

KATHY ST. HILAIRE, ETC.

Plaintiff, Appellant,

v.

CITY OF LACONIA, ET AL.

Defendants, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE 

[Hon. Paul J. Barbadoro, U.S. District Judge] 



Before

Lynch, Circuit Judge, 

Aldrich and Campbell, Senior Circuit Judges. 



David H. Bownes, with whom A. G. O'Neil, Jr. and Normandin, 
Cheney & O'Neil were on brief, for appellant. 
Wayne C. Beyer, with whom Wayne C. Beyer and Associates, P.C. was 
on brief, for appellees City of Laconia, Town of Belmont, David A.
Gunter, David Nielsen, and Brian Loanes.
Donald J. Perrault, with whom Christine Desmarais-Gordon and 
Wadleigh, Starr, Peters, Dunn & Chiesa were on brief, for appellees 
County of Belknap, Robert Dupuis, Jr., and Daniel Collis.



December 1, 1995


LYNCH, Circuit Judge. A tragic sequence of events LYNCH, Circuit Judge. 

leaving Philip St. Hilaire dead from wounds from a police

bullet and leaving law enforcement officers and their

municipal employers sued by his widow brings this case before

us. The district court entered summary judgment against the

widow's action under 42 U.S.C. 1983, finding that the

officers were protected by qualified immunity. Mrs. St.

Hilaire appeals, saying there are genuine disputes of

material fact and that the officers abrogated clearly

established constitutional rights. We hold that while there

are disputes of fact, those disputes are not material. We

affirm because the defendants are entitled to qualified

immunity in that they did not violate any constitutional law

that was clearly established at the time of the shooting and

they could reasonably have believed their search warrant was

supported by probable cause.

FACTS

Armed with some evidence (the sufficiency of which

plaintiff challenges), Deputy Robert Dupuis of the Belknap

County Sheriff's Office applied for a search warrant from the

local district court to search both the person of Philip St.

Hilaire and his place of business, Laconia Auto Wrecking.

Based on information from a confidential informant, the

police believed St. Hilaire was selling cocaine at Laconia

Auto Wrecking and that he had just travelled to New York to

-2- 2

"score" a load of cocaine. The warrant issued and the police

planned their operation to execute the search warrant.

It was a joint operation between the Belknap

Sheriff's Office, the Belknap Police and the Laconia Police.

The participants -- defendants Deputy Dupuis, Deputy Daniel

Collis, Sgt. David Nielsen, Sgt. Brian Loanes, and Detective

David Gunter -- met in the early evening of April 27, 1990.

The police believed St. Hilaire to be armed and possibly

dangerous. They knew that St. Hilaire carried a .357 caliber

revolver or a .25 caliber semi-automatic pistol, or both, and

that he had a shotgun and a crossbow on the premises. They

also had information that St. Hilaire had, a few days

earlier, pointed a gun at the head of a person who had

stooped to pick up St. Hilaire's dropped money bag. The

police had also received complaints some time earlier about

the sounds of shooting from the auto yard.

The police were concerned about the reflective

glass on the front of Laconia Auto Wrecking, which made it

difficult for people outside to see in but easy for people

inside to see out. They felt it would be a danger to the

police to approach the front of the building abruptly.

They decided that Deputy Dupuis and Sergeants

Nielsen and Loanes would execute the search warrant.

Detective Gunter, stationed across the street to help with

surveillance, would then come in with his drug dog, Lux.

-3- 3

Deputy Sheriff Collis was also stationed across the street,

monitoring the auto yard, in radio communication with Dupuis.

Sergeant Nielsen was in uniform; the remaining four defendant

officers were in plain clothes. The search team waited at

the rear of the building. Patrolmen in two marked cruisers

were stationed on the road on either side of the business. 

The plan was as follows. The team, led by Sgt.

Nielsen would enter the building and then search St. Hilaire

and the building. If the building was closed, the officers

would find a way to enter or would wait for St. Hilaire to

emerge and then reach him outside. They planned to identify

themselves as law enforcement officers and state their

purpose. Sergeant Nielsen was to lead because he was in

uniform and St. Hilaire knew him from prior encounters. The

officers thought this would be the safest way to proceed.

Detective Gunter testified that, in execution of a search

warrant, the best policy is to make sure the subject

understands that he is dealing with a police officer. 

Things did not go according to plan. After

watching someone else unsuccessfully trying to get in to the

building, Collis concluded that the front door was likely

locked and radioed so to Dupuis. Dupuis decided on more

manpower and called Detective Gunter over to join the team

waiting behind the building. Collis then saw St. Hilaire

leave the building with his dog, lock up, and walk toward his

-4- 4

car in the parking lot. Collis radioed this information to

Dupuis. 

The team, waiting behind the auto-wrecking

building, decided to move in. Detective Gunter, who was

closest to the parking lot, ran in front, ahead of the

others. The police rounded the corner of the building and

travelled the roughly 125 feet to the car in a period of

seconds, hoping to reach St. Hilaire before he got into his

car. It was not to be. St. Hilaire had already put his dog

in the back seat, gotten into the driver's seat of his car

and turned on the engine. Detective Gunter, who was dressed

in jeans and a t-shirt, ran up to the car.

St. Hilaire, at that moment, looked up and saw a

stranger dressed in jeans and a t-shirt, approach his open

car passenger window, pointing a .357 magnum revolver toward

him. St. Hilaire's eyes widened. St. Hilaire reached for

his own gun, or so it appeared to Detective Gunter.

Detective Gunter fired a bullet, hitting St. Hilaire in the

neck. The bullet lodged in St. Hilaire's vertebra,

paralyzing him from the neck down. 

Sergeant Nielsen, in uniform, reached the car next.

He saw that St. Hilaire's right hand was on top of a gun on

the car seat. Sergeant Nielsen told St. Hilaire to let go of

the gun. St. Hilaire replied that he could not, that he

could not move. The police removed the gun. 

-5- 5

St. Hilaire said to Sgt. Nielsen, "I didn't know

you guys were the cops. Why didn't he identify himself? Why

didn't he say he was a cop?" Later, at the hospital

emergency room, St. Hilaire repeatedly told his nurse, "He

didn't identify himself." St. Hilaire made the same

statements to his wife.

The police testified, at deposition, that they did

identify themselves. Detective Gunter testified that when he

was halfway to the car he yelled, "Phil, police, Phil" and

then, at the side of the car, he yelled "Hold it." He also

testified, "I'm sure I yelled 'police,' but I don't

remember." Sergeant Nielsen said that he heard Detective

Gunter say, "Hold it Phil, police. Hold it, police," as

Detective Gunter was about a foot away from the passenger

side of the car. Deputy Dupuis said he was just behind

Detective Gunter and heard Detective Gunter yell "Phil,

police." Deputy Dupuis said he also yelled, "Police" as he

rounded the building, some 58 feet from the car. Sergeant

Loanes said he heard someone say something like "Police,

freeze." Two other officers, who had been stationed across

the street, heard someone yell, "Police." One of them,

Collis, heard "Police" within two seconds of the gunshot. A

passing motorist heard "Freeze," just before seeing the flash

of a gun. Detective Gunter also said he had his police badge

held in his extended left hand as he approached the car.

-6- 6

Dupuis saw the badge in Detective Gunter's left hand

immediately after the shooting.

Some currency and a bag containing three-fourths of

an ounce of cocaine, worth about $2,200, were recovered from

St. Hilaire's jacket. St. Hilaire died in October 1991 as a

result of complications from his injuries. He was forty

years old.

LEGAL CLAIMS

Kathy St. Hilaire brought suit individually and as

executrix of the estate under 42 U.S.C. 1983 asserting that

defendants had violated the Fourth Amendment. She also

brought pendent state law claims for negligence and negligent

and intentional infliction of emotional distress.

Plaintiff's Fourth Amendment theories were that the search

warrant was obtained without probable cause and that the

defendants "used unreasonable force in executing a search

warrant upon her husband in that they failed to identify

themselves as police officers and then shot her husband when

he failed to yield."

The district court entered summary judgment based

on qualified immunity. That decision is reviewed de novo. 

Hegarty v. Somerset County, 53 F.3d 1367, 1372 (1st Cir. 

1995)(citing Jirau-Bernal v. Agrait, 37 F.3d 1, 3 (1st Cir. 

1994)), petition for cert. filed (U.S. Oct. 17, 1995) (No. 

-7- 7

95-629). All facts are reviewed in the light most favorable

to the party opposing summary judgment. Id. 

The ultimate question of qualified immunity should

ordinarily be decided by the court.1 Hunter v. Bryant, 502 

U.S. 224, 228 (1991). In determining whether there is a

qualified immunity defense "the court should ask whether the

agents acted reasonably under settled law in the

circumstances." Id. This court has identified two prongs to 

 

1. While this court has not had the occasion to explore
fully the allocation of functions between judge and jury
where facts relevant to the immunity defense are in dispute,
we have said that "we doubt the Supreme Court intended this
dispute to be resolved from the bench by fiat." Prokey v. 
Watkins, 942 F.2d 67, 72 (1st Cir. 1991). The ultimate 
question of whether a reasonable police officer, on the basis
of information known to him, could have believed his actions
were in accord with constitutional rights is "a question of
law, subject to resolution by the judge not the jury." Id. 
at 73. But if there is a factual dispute, "that factual
dispute must be resolved by a fact finder." Id. The precise 
question of whether the judge may intercede and play that
fact finder role appears not to have been clearly decided by
the Supreme Court. Some courts, consonant with the Seventh
Amendment, have preserved the fact finding function of the
jury through special interrogatories to the jury as to the
disputes of fact, reserving the ultimate law question to the
judge. See King v. Macri, 993 F.2d 294, 299 (2d Cir. 1993); 
Warren v. Dwyer, 906 F.2d 70, 76 (2d Cir.), cert. denied, 498 
U.S. 967 (1990); Lubcke v. Boise City/Ada Cty. Housing Auth., 
124 Idaho 450, 860 P.2d 653, 667 (1993); see also Oliveira 
v. Mayer, 23 F.3d 642, 649 (2d Cir. 1994) (when material 
facts were disputed, issue of qualified immunity was for the
jury), cert. denied, 115 S. Ct. 721 (1995); Karnes v. 
Skrutski, 62 F.3d 485, 491 (3d Cir. 1995)(same); Presley v. 
City of Benbrook, 4 F.3d 405, 410 (5th Cir. 1993) (if there 
remain disputed issues of material fact, jury, properly
instructed, may decide issue of qualified immunity);
Brandenburg v. Cureton, 882 F.2d 211, 216 (6th Cir. 1989) 
(jury is final arbiter of qualified immunity when issue
depends upon which version of the facts the jury finds).

-8- 8

the basic qualified immunity analysis. Hegarty, 53 F.3d at 

1373 (quoting Burns v. Loranger, 907 F.2d 233, 235-36 (1st 

Cir. 1990)). First, the court must establish whether the

constitutional right asserted by the plaintiff was "clearly

established" at the time of the alleged violation. Id. 

Second, the court must ask whether "a reasonable official

situated in the same circumstances should have understood

that the challenged conduct violated that established right."

Id. (quoting Burns, 907 F.2d at 236). 

Whether the rights alleged are "clearly

established" is a question of law for the court. Elder v. 

Holloway, 114 S. Ct. 1019, 1023 (1994). For purposes of 

determining qualified immunity, the officer's actions are

measured by a standard of "objective legal reasonableness . .

. in light of the legal rules that were clearly established

at the time [they] were taken."2 Anderson v. Creighton, 483 

U.S. 635, 639 (1987) (internal quotation omitted). 

The Supreme Court, recognizing that the use of

summary judgment in qualified immunity cases could be

undermined, has held that a very broad articulation of the

 

2. This court has noted that, at least in police misconduct
cases, the objective reasonableness standard for liability is
most likely the same as that for a qualified immunity
defense. Roy v. Inhabitants of the City of Lewiston, 42 F.3d 
691, 694 (1st Cir. 1994). But see Oliveira, 23 F.3d at 648- 
49 (maintaining that the two standards are distinct). In any
event, we draw on the cases decided in the liability context
for guidance in deciding the qualified immunity question.
See, e.g., Graham v. Connor, 490 U.S. 386, 397 (1989). 

-9- 9

"clearly" established law at the time of the alleged

violation is inappropriate:

[T]he right the official is alleged to
have violated must have been "clearly
established" in a more particularized,
and hence more relevant, sense: The
contours of the right must be
sufficiently clear that a reasonable
official would understand that what he is
doing violates that right.

Anderson, 483 U.S. at 640. Without such a rule, the Court 

said, "[a] passably clever plaintiff would always be able to

identify an abstract clearly established right that the

defendant could be alleged to have violated," id. at 640 n.2, 

and so defeat summary judgment.3

The Court has also warned against requiring too

great a specificity in the "clearly established law" such

that the officer would be granted qualified immunity "unless

the very action in question ha[d] previously been held

unlawful." Anderson, 483 U.S. at 640. An earlier warning 

against exactly such a misapplication of the qualified

immunity doctrine was given in Mitchell v. Forsyth, 472 U.S. 

511 (1985), a warning cited in Anderson. In Mitchell the 

court noted:

We do not intend to suggest that an
official is always immune from liability

 

3. Similarly, we note, a "passably clever" defendant might
characterize the right involved in such broad terms as to say
such a broad articulation could not permit a reasonable
official to understand that what he is doing violates that
right and so the right was not "clearly established."

-10- 10

or suit for a warrantless search merely
because the warrant requirement has never
explicitly been held to apply to a search
conducted in identical circumstances.

472 U.S. at 535 n.12. The proper characterization of the

"clearly established law" is implicated in this case. 

The Shooting 

Plaintiff asserts two Fourth Amendment theories as

to the shooting, both independent of her Fourth Amendment

claim as to the warrant. Plaintiff argues that "[n]o

reasonable law enforcement agent could believe that in

executing a search warrant the law allowed him to surprise a

suspect on a dead run, in plain clothes, with gun drawn at

close range, and not provide that individual with adequate

and reasonable notice of his identity and his lawful

purpose." Plaintiff also argues that the facts of record

"are sufficient to raise a material and genuine issue as to

whether [Detective] Gunter had a reasonable belief he was

acting in self defense." She claims that the "resolution of

these issues is an inherently fact-based matter for the jury

as no other officers observed the alleged conduct of St.

Hilaire in reaching for the weapon." The latter claim is, we

believe, without merit. The first claim, that the police

were required to identify themselves and their lawful

purpose, however, raises difficult issues.

Plaintiff argues that summary judgment was improper

because there were material facts in dispute. We agree that

-11- 11

there is, on the record, a dispute of fact as to whether the

police did identify themselves. St. Hilaire's first words,

as he sat with a bullet hole in his neck, were to ask why the

police had not identified themselves. He repeated this

question at the hospital and told his nurses and his wife

that the police did not identify themselves. While an

inference can be drawn from the deposition testimony of the

officers that St. Hilaire simply did not hear the

identifications given by the police, another plausible

inference could be drawn that the police did not identify

themselves. A passing motorist who heard the police say

"freeze" did not hear the word "police" mentioned, although

the police testimony is that the two words were uttered

together. Where "inferences to be drawn from the web of

facts are disputed and unclear -- and are likely to depend on

credibility judgments," there is a dispute of fact. Prokey 

v. Watkins, 942 F.2d 67, 73 (1st Cir. 1991). 

The existence of a factual dispute does not end the

inquiry. In summary judgment terms, the disputed fact must

be material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 

248 (1986). In the context of a qualified immunity defense,

the legal questions for the court to decide may well

determine if the dispute is material. Here, the district

court acknowledged that the plaintiff's argument raised "more

troubling questions." The court also assumed, without

-12- 12

deciding, that plaintiff had raised a genuine factual dispute

as to whether defendants identified themselves as they

approached St. Hilaire's vehicle. St. Hilaire v. City of 

Laconia, 885 F. Supp. 349, 357 n.2 (D.N.H. 1995). 

The court nonetheless entered summary judgment for

defendants, on the grounds that defendants did not violate

any "clearly established" law. It reasoned that St.

Hilaire's Fourth Amendment rights did not attach until the

seizure actually occurred and that the shooting constituted

the seizure. Id. at 357 n.3. It reasoned that the issue 

before it was whether there was a clearly established

obligation under the Fourth Amendment for police not

unreasonably to create circumstances where the use of deadly

force becomes necessary and if so, whether any such

obligation was "clearly established." Id. at 356-57. It 

said there was no such clearly established obligation. 

The district court analysis was reasoned and

grounded on law from other Circuits. See id. at 357-58 

(citing Drewitt v. Pratt, 999 F.2d 774, 780 (4th Cir. 1993) 

(look only to whether it was reasonable for police officer to

shoot in the circumstances as they existed at that moment);

Cole v. Bone, 993 F.2d 1328, 1333 (8th Cir. 1993) ("we 

scrutinize only the seizure itself, not the events leading to

the seizure"); Carter v. Buscher, 973 F.2d 1328, 1332 (7th 

Cir. 1992) ("[P]re-seizure conduct is not subject to Fourth

-13- 13

Amendment scrutiny.")). We believe that reasoning to be in

error and to create some of the difficulties warned against

in Mitchell and Anderson. We nonetheless affirm on the 

ground that the factual dispute as to whether the defendant

officers identified themselves as they approached St. Hilaire

is immaterial as a matter of law.

We first reject defendants' analysis that the

police officers' actions need be examined for

"reasonableness" under the Fourth Amendment only at the

moment of the shooting. We believe that view is inconsistent

with Supreme Court decisions and with the law of this

Circuit. The Supreme Court in Brower v. Inyo, 489 U.S. 593 

(1989), held that once it has been established that a seizure

has occurred, the court should examine the actions of the

government officials leading up to the seizure.4 The Court

held that petitioners' decedent was "seized" when he crashed

into a police roadblock set up in order to stop his flight.

 

4. The district court's citation of California v. Hodari D., 
499 U.S. 621 (1991), is inapposite. The question before the
Supreme Court in Hodari was whether the defendant, who 
discarded cocaine while being pursued by police, had been
"seized" at the time he dropped the drugs, for the purpose of
determining whether the drugs were the fruit of an illegal
seizure. Id. at 623. Thus, the question was not whether the 
seizure was reasonable, which requires an examination of the 
totality of the circumstances, but whether there had been a
seizure at all. We do not read this case as forbidding
courts from examining circumstances leading up to a seizure,
once it is established that there has been a seizure. We 
understand Hodari to hold that the Fourth Amendment does not 
come into play unless there has been a seizure, not that it 
does not come into play until there has been a seizure. 

-14- 14

"We think it enough for a seizure that a person be stopped by

the very instrumentality set in motion or put in place in

order to achieve that result." Id. at 599. The Court 

remanded the cause for a determination of whether the seizure

was "unreasonable" in light of petitioners' allegations that

the roadblock had been set up in such a manner as to be

likely to kill the decedent. Id.; see also Plakas v. 

Drinski, 19 F.3d 1143, 1150 (7th Cir.) ("[W]e carve up the 

incident into segments and judge each on its own terms to see

if the officer was reasonable at each stage."), cert. denied, 

115 S. Ct. 81 (1994).

This court has recently followed a similar

approach. In Hegarty, this court examined each of the 

actions leading up to the mortal wounding of a woman whom

police officers were attempting to arrest for recklessly

endangering the safety of four campers. 53 F.3d 1367.

Instead of focusing solely on whether the officer who shot

Hegarty was acting in self-defense at the moment of the

shooting (Hegarty had picked up a rifle and raised it in the

direction of the officers and ignored their demands to drop

it), the court examined all of the actions of the officers to

determine whether there was probable cause to arrest Hegarty

and whether there were exigent circumstances to allow a

forcible, warrantless, nighttime entry into her dwelling.

Id. at 1374-79. Similarly, in Roy v. Lewiston, this court 

-15- 15

examined all of the surrounding circumstances in determining

whether the police acted reasonably: "Roy was armed; he

apparently tried to kick and strike at the officers; he

disobeyed repeated instructions to put down the weapons; and

the officers had other reasons . . . for thinking him capable

of assault." 42 F.3d at 695.

This focus on the moment of the shooting led the

district court to conclude that the issue was whether there

was any clearly established constitutional duty on the part

of police to avoid creating situations which increased the

risk of use of deadly force. The district court concluded

there was no such generalized duty. Cf. Carter v. Buscher, 

973 F.2d 1328, 1331-33 (7th Cir. 1992) (reading Brower to 

mean that courts should consider reasonableness of seizure in

totality of circumstances, but should not consider whether it

was reasonable for the police to create the circumstances).

But at the core of plaintiff's case is not the broad

contention that the police have a duty to reduce the risk of

violence. Such a contention itself creates a risk that the

"duty" is so broadly defined that it gives inadequate notice

of what would violate the duty and thus would fall back on

whether those specific facts have occurred in the case law

before. Plaintiff instead makes a narrower, more specific

claim. 

-16- 16

Plaintiff contends that in executing a search

warrant, the Fourth Amendment's prohibition against

"unreasonable searches" requires the police to identify

themselves as police and state their purpose.5 Plaintiff's

theory is that if the police had properly identified

themselves, St. Hilaire would have known they were police,

would not have himself felt endangered when he saw a stranger

approach with a gun in his hand, and that St. Hilaire would

not have made a movement in the direction of his gun. It is

that movement which led Detective Gunter to fire his own

weapon. There is some additional support in the record for

plaintiff's theory. St. Hilaire and the police had had prior

dealings. In each, the police identified themselves and St.

Hilaire did not threaten them.

It falls to the court to determine whether this

right allegedly violated was "clearly established" at the

time of the incident. "Whether an asserted federal right was

clearly established at a particular time, so that a public

 

5. Plaintiff relies on Tennessee v. Garner, 471 U.S. 1 
(1985), which held that the Fourth Amendment prohibits use of
deadly force to prevent the escape of an apparently unarmed
suspected felon unless it is necessary to prevent the escape
and the officer has probable cause to believe that the
suspect poses a significant threat of death or serious
physical injury to the officer or others. Garner indeed 
establishes that "apprehension by the use of deadly force is
a seizure subject to the reasonableness requirement of the
Fourth Amendment." Id. at 6. But Garner, while helpful, did 
not resolve immunity issues in that case, nor does it do so
here.

-17- 17

official who allegedly violated the right has no qualified

immunity from suit, presents a question of law." Elder, 114 

S. Ct. at 1022.

Plaintiff relies on the Supreme Court's recent

decision in Wilson v. Arkansas, 115 S. Ct. 1914 (1995), which 

held that the reasonableness of the search of a dwelling

depended in part on whether law enforcement officers

announced their presence and authority prior to entering,

thus incorporating the common law "knock and announce" rule

into the Fourth Amendment.

Assuming arguendo that the Wilson rule supports 

plaintiff's case,6 plaintiff's argument succeeds only if

Wilson merely restated what was already clearly established 

constitutional law at the time of the shooting in 1990. See 

Davis v. Scherer, 468 U.S. 183 (1984) (constitutional right 

to a pretermination or prompt post-termination hearing was

 

6. Fourth Amendment law in some contexts recognizes a
distinction between a person's home and a person's car. For
example, the Fourth Amendment permits a slightly broader
search pursuant to the arrest of the occupant of a vehicle
and some warrantless searches of vehicles are permitted even
if there are not emergency circumstances. See generally 1 
Wayne R. LaFave & Jerold H. Israel, Criminal Procedure 3.7 
(1984). One explanation for the different protection of
items found in vehicles is that "[o]ne has a lesser
expectation of privacy in a motor vehicle because its
function is transportation and it seldom serves as one's
residence or as the repository of personal effects . . . .
It travels public thoroughfares where both its occupants and
its contents are in plain view." United States v. Chadwick, 
433 U.S. 1, 12 (1977) (quoting Cardwell v. Lewis, 417 U.S. 
583, 590 (1974)).

-18- 18

not yet clearly established at time of discharge and it

availed plaintiff not that defendant state officials violated

state administrative regulations requiring such hearing

because 1983 protects constitutional rights); Elder, 114 S. 

Ct. at 1023 ("[T]he clearly established right [must] be [a]

federal right."); Harlow, 457 U.S. at 818. Thus, in order 

for the plaintiff to prevail, the notice requirement must

have been clearly rooted in the Fourth Amendment

jurisprudence in 1990. Plaintiff's argument fails because at

the time of the shooting the notice requirement was not

clearly of constitutional dimension.

The Court in Wilson noted that it had "never 

squarely held that this [common law] principle [of

announcement] is an element of the reasonableness inquiry

under the Fourth Amendment." 115 S. Ct. at 1918. The

Supreme Court granted certiorari in Wilson precisely in order 

to resolve a conflict among state courts as to whether the

common-law notice requirement was a part of the

reasonableness inquiry under the Fourth Amendment. Id. at 

1916. The Court noted that in California and Illinois, it

had been so held, but in Massachusetts, it had been held

merely a rule of common law, not constitutionally compelled.

Id. at 1916 n.1. The highest court in New Hampshire had held 

only that there was a common law rule that "police officers,

before forcibly entering a dwelling, should knock, identify

-19- 19

themselves and their purpose, and demand admittance." State 

v. Jones, 127 N.H. 515, 503 A.2d 802, 805 (1985). The court 

in Jones further held that this rule "ha[d] its basis in the 

common law" but did not foreclose the possibility that a

failure to knock and announce may be so flagrant that a

subsequent entry could violate the state constitution's

prohibition against unreasonable searches and seizures. Id. 

at 805-06. The issue of whether the search at issue violated

the federal constitution was not before the New Hampshire

court. Id. at 805. Cf. Prokey, 942 F.2d at 72 n.5 (looking 

to Maine law definition of probable cause as to immunity

question).

The First Circuit has not decided whether a search

in violation of the "knock and announce" rule violated the

Fourth Amendment, although it has considered alleged

violations of the federal "knock and announce" statute

applicable to federal officers, 18 U.S.C. 3109. See, 

e.g., United States v. One Parcel of Real Property, 873 F.2d 

7, 9 (1st Cir.), cert. denied sub nom. Latraverse v. United 

States, 493 U.S. 891 (1989); United States v. DeLutis, 722 

F.2d 902, 908-09 (1st Cir. 1983). Thus, the established law

at the time of the shooting was that the notice requirement

was embodied in New Hampshire's common law. It was not,

though, clearly established in this Circuit as a

constitutional requirement until Wilson. In a 1983 action, 

-20- 20

plaintiffs must show the constitutional right involved was 

clearly established. Davis, 468 U.S. at 194. Accordingly, 

under Harlow the defendants are entitled to qualified 

immunity on this theory.

As to the plaintiff's theory that there were

disputed facts as to whether Detective Gunter had a

reasonable belief he was acting in self-defense when he shot

St. Hilaire, we, like the district court, see no such

dispute. See 885 F. Supp. at 356-57. The judgment Detective 

Gunter made in that split second was at the very least

reasonable, and it is not the role of the court to second-

guess the decision. See, e.g., Hegarty, 53 F.3d at 1377; see 

also Hunter, 502 U.S. at 229; Anderson, 483 U.S. at 641. 

The Search Warrant. 

Whether or not there was probable cause for the

warrant, defendants are entitled to qualified immunity unless

"the warrant application is so lacking in indicia of probable

cause as to render official belief in its existence

unreasonable." Malley v. Briggs, 475 U.S. 335, 344-345 

(1986).

The facts presented in the warrant application are

not disputed. We are thus left with the question of whether

defendants are entitled to qualified immunity as a matter of

law. Fed. R. Civ. P. 56(c). Recognizing that the police may

not obtain immunity by relying on the judgment of the

-21- 21

judicial officer issuing the warrant under Malley, the 

defendants argue that there were reasonable indicia of

probable cause and their belief they had probable cause can

not be called unreasonable. That is, indeed, what the

undisputed record demonstrates. A confidential informant

told Deputy Dupuis that St. Hilaire was selling cocaine from

Laconia Auto Wrecking, which was owned and operated by St.

Hilaire. Dupuis consulted with detectives at the Laconia and

Belmont Police Departments who had worked with the

confidential informant on prior occasions. These detectives

told Dupuis that the informant had twice previously provided

information that led to seizures of contraband and the

arrests and convictions of several persons. The informant

then met with Dupuis and Detective Gunter in order to make a

controlled purchase at Laconia Auto Wrecking. The substance

purchased tested positive for cocaine. A second controlled

purchase was made; the substance obtained also tested

positive for cocaine. The informant also told Dupuis that

St. Hilaire was going to New York to "score" a load of

cocaine. Airline records confirmed that St. Hilaire had made

a reservation to fly to New York around the same time as the

informant's report.

Summary judgment in favor of the municipalities,

the City of Laconia, the Town of Belmont and the County of

Belknap, is affirmed because there is no evidence, even had

-22- 22

plaintiff shown a deprivation of St. Hilaire's constitutional

rights, that it was as a result of official action taken

pursuant to a "custom or usage" of the municipality. See 

Monell v. New York City Dep't. of Social Servs. 436 U.S. 658, 

691 (1978). Other than this single incident, there is no

evidence even proffered to show such a municipal "custom and

usage." Evidence of a single incident is usually

insufficient to establish a "custom or usage." Mahan v. 

Plymouth County House of Corrections, 64 F.3d 14, 16-17 (1st 

Cir. 1995).

Municipal Defendants 

The claims against the municipal defendants

necessarily fail because we find there was no deprivation of

St. Hilaire's clearly established rights and there was

reasonable ground to believe the warrant supported by

probable cause.

The judgment of the district court is affirmed. No 

costs are awarded. 

-23- 23