**Christopher MEDEIROS, Plaintiff,**

v.

**TOWN OF DRACUT, Barry Cregg, Kevin Richardson, and James Wagner, Defendants.**

**No. 96–12334–ZRK.**

United States District Court, D. Massachusetts.

Sept. 18, 1998.

Charles Kazarian, Boston, MA, for Plaintiff.

Douglas I. Louison, Merrick and Louison, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS, TOWN OF DRACUT, CREGG, RICHARDSON AND WAGNER'S, MOTION FOR SUMMARY JUDGMENT

KAROL, United States Magistrate Judge.

This is an action brought by Christopher Medeiros ("plaintiff") against the Town of

Dracut and three of its police officers. Plaintiff alleges, *inter alia*, that the defendants violated his civil rights under 42 U.S.C. § 1983 ("section 1983") and M.G.L. c. 12 § 111 during a police stop that resulted in plaintiff being struck and injured by two police bullets.

Plaintiff originally filed this action in Middlesex Superior Court. Defendants removed the case on November 21, 1996 pursuant to 28 U.S.C. § 1441 (Docket No. 1). On October 9, 1997, the parties consented to have a United States Magistrate Judge conduct any and all further proceedings in the case, including trial and entry of a final judgment. (Docket No. 25).

Before this court is defendants' motion for summary judgment on the defense of qualified immunity. Oral argument was heard on September 8, 1998. The parties have stipulated that the "record, exhibits and stipulated facts to be relied on in support and opposition for/to the summary judgment motion will be limited to the deposition testimony and materials developed by police sources previously obtained through discovery, excluding that of the plaintiff." ("Joint Stipulation for Summary Judgment Motion," Docket No. 29).[1] The court presents the facts below according to the parties' stipulation.

## BACKGROUND

On the afternoon of September 20, 1983, Dracut Police Officer Barry Cregg ("Cregg") received a radio call to investigate a possible housebreak on Jackson Avenue in Dracut. Less than one-quarter mile from his destination, Cregg observed from his cruiser two men standing on the side of Merrimack Avenue next to a motor vehicle, one of them facing Cregg and the other with his back turned. Cregg saw the man facing him say something to his companion and the companion abruptly turn and look at Cregg. The pair then crossed Merrimack Avenue, walking toward a second motor vehicle. These two men were later identified as plaintiff and one Kerry Hughes.

As Cregg drove closer, he saw that the vehicles had New Hampshire license plates.[2] Cregg also noticed that one of the vehicles had a broken windshield. Based on the reported housebreak, the presence of two unfamiliar vehicles with New Hampshire plates, the broken windshield and the two men's abrupt behavior on seeing him, Cregg executed a U-turn and pulled up behind the brown pickup truck toward which the two men had walked.

Cregg radioed that he would be stopping two male subjects and then exited his cruiser. After speaking to the men, Cregg requested and received identification from both of them. During the course of the ensuing conversation, Cregg felt that the men were increasingly nervous and that each of them was alternately trying to get behind him as he spoke with the other.

Less than five minutes after Cregg's call, Inspector James Wagner ("Wagner") arrived at the scene, parking his cruiser in front of the brown pickup. Cregg told Wagner that he "had a housebreak," "a broken windshield," and that the two men were "way too nervous." (Cregg Deposition at 48). Cregg asked Wagner to watch the men while he went to Wagner's cruiser to check their identification.

As Cregg went to run the identification check, Sergeant Kevin Richardson ("Richardson") pulled up next to Wagner's cruiser (in response to Cregg's radio request for assistance). Cregg told Richardson of the reported housebreak and the broken windshield, and Richardson directed Cregg to run the identification check.[3]

---

1. The parties have agreed further that if this court enters summary judgment for the individual defendants on plaintiff's section 1983 claim, "plaintiff agrees to waive all other claims against the Town of Dracut and the individual defendants and will agree that judgment enter in favor of the defendants." *Id.* Therefore, if the individual defendants prevail on this defense of qualified immunity, *all* claims, federal and state, against *all* defendants must be dismissed.

2. According to Cregg, Merrimack Avenue in Dracut is no more than five to ten miles from the New Hampshire–Massachusetts border.

3. Upon further review of the record, the court realizes that it misspoke at oral argument by suggesting that Richardson was aware of plaintiff and Hughes' attempts to get behind Cregg. Cregg had not told Richardson of this, and Richardson did not have this information when he

After exiting his cruiser, Richardson saw plaintiff pacing and that he looked "extremely nervous." Richardson thought that there was "something wrong" with the scene. (Richardson Deposition at 12–13).

A few seconds later, standing between his and Wagner's cruiser, Richardson watched Wagner attempt to pat frisk Hughes toward the rear of the brown pick-up. Suddenly, Hughes spun to his left, faced Wagner and shoved him away. As Wagner approached Hughes again, Hughes drew a semi-automatic weapon from beneath his sweater and pointed it directly at Wagner's face. Richardson heard Wagner scream "Gun!" and watched Wagner retreat for cover in the direction of Cregg's cruiser. Hughes pursued Wagner with the drawn weapon.

From a vantage point of approximately 45 feet, Richardson saw Hughes squeeze or jerk something on the weapon, although he could not tell whether Hughes squeezed the trigger.[4] At this point, Richardson unholstered his weapon and fired one shot at Hughes. Plaintiff was not in Richardson's direct line of fire. (Richardson Deposition at 24). As Richardson fired, however, he saw movement out of the corner of his eye.

Richardson turned quickly to see plaintiff put his hands down, run and dive behind the open door of the brown pickup truck, "like he was going into the cab of a truck." (Richardson Deposition at 25). Richardson fired two shots at the door of the vehicle that plaintiff was behind, "to put down cover fire" and to "let Mr. Medeiros know that I knew he was there." (Richardson Deposition at 27). These two shots struck plaintiff in the right arm and the right leg, respectively.[5]

Richardson, now running toward Wagner, once again directed his fire at Hughes. Richardson, along with Cregg and Wagner, who also were firing their weapons, ultimately subdued Hughes and seized the semi-automatic. Neither Wagner nor Cregg shot at or participated in taking custody of plaintiff.

Investigation following the incident revealed that plaintiff was unarmed, and a post-incident search of the brown pickup yielded no weapon. Plaintiff was never charged with any crime. Although Hughes was armed, he did not fire his weapon. After retrieving spent shell casings, State Police investigators determined that the officers fired at least 12 rounds at Hughes and plaintiff. (Ex. B. attached to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, Docket No. 32).

## APPLICABLE LAW

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Rivera v. Murphy,* 979 F.2d 259, 261 (1st Cir.1992). This court must assume that a jury would resolve credibility issues and draw reasonable inferences in favor of the non-moving party, *Rivera,* 979 F.2d at 261, subject in this case, however, to the parties' stipulation that only evidence developed by police sources will be considered in determining whether a credibility issue exists. Only disputes of fact that might affect the outcome of the suit—material facts—preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

▮▮▮ Qualified immunity, the defense on which defendants presently rely, shields law enforcement officials who reasonably but mistakenly believe that they are acting in accordance with constitutional mandates. *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). The doctrine protects against the possibility that

---

assessed the scene. This error is not material in light of the court's analysis.

**4.** Richardson later stated that he was not certain whether the hammer on the weapon was "cocked," and thus in a position from which the weapon could be fired. Cregg saw Hughes "crank" a live round out of the semi-automatic. (Cregg Deposition at 62). State Police investiga-

tors later found a live round near where Hughes was shot. (Ex. B. attached to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, Docket No. 32).

**5.** Doctors later removed the slugs from plaintiff at a nearby hospital. Plaintiff claims permanent damage to his arm and leg as well as constant lingering pain.

"fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Qualified immunity therefore "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Anderson*, 483 U.S. at 638–39, 107 S.Ct. 3034 (1986) (citing *Malley v. Briggs*, 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).[6]

■ In *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court announced a similar standard for analyzing the merits of a claim that police officers have used excessive force. 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691, 695 (1st Cir.1994). It held that a court must decide whether an officer's conduct was objectively reasonable under the circumstances. *Graham*, 490 U.S. at 395, 109 S.Ct. 1865 (1989). In so doing, courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against any countervailing government interests at stake. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. This balancing process must allow for whether the suspect poses an immediate threat to the safety of police officers or others. *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

■ In addition, the calculus must also allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Both the Supreme Court and the First Circuit have afforded a comparatively generous standard of reasonableness to the police in cases where potential danger, emergency conditions, or other exigent circumstances are present. *See, e.g., id.*, 490 U.S. at 396, 109 S.Ct. 1865 ("The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); *Hegarty v. Somerset County*, 53 F.3d 1367, 1377 (1st Cir.), *cert. denied*, 516 U.S. 1029, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995) (qualified immunity doctrine "insulate[s] from judicial second guessing" in life-endangering circumstances); *Roy*, 42 F.3d at 695 (1st Cir.1994) ("[t]he Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases").

With the summary judgment, qualified immunity and excessive force standards in place, we should pause to determine how they interact.

■ Summary judgment motions in the qualified immunity context raise a complex question as to the appropriate roles of judge and jury. The ultimate question of qualified immunity is one of law and should be decided by the court. *Hunter*, 502 U.S. at 228, 112 S.Ct. 534. At the same time, factual disputes over the precise circumstances an officer faced—disputes ordinarily resolved by a jury at trial—surely affect the ultimate question of whether a reasonable police officer could have believed his actions were in accord with a plaintiff's constitutional rights. *See id.*

The First Circuit has acknowledged the dilemma where facts relevant to the immunity defense are in dispute. *Ringuette v. City of Fall River*, 146 F.3d 1, 6 (1st Cir.1998) ("Something of a 'black hole' exists in the law...."); *Prokey v. Watkins*, 942 F.2d 67, 72 (1st Cir.1991) ("[w]e doubt the Supreme Court intended this dispute to be resolved from the bench by fiat"). Nevertheless, where there are no disputed issues of material fact relevant to immunity, the First and other Circuits appear to preserve for the

---

**6.** There are, of course, two questions to be addressed in any qualified immunity analysis. The first question, whether the right the plaintiff claims the defendant infringed was "clearly established" at the time of the alleged violation, is not at issue in this case. It is undisputed that, at the time of this incident, the Fourth Amendment protected against seizures effected through the government's use of excessive force, *see, e.g., Graham*, 490 U.S. at 395, 109 S.Ct. 1865, and that an intentional shooting by a police officer constituted a seizure. *Landol–Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir.1990).

court the ultimate question of the reasonableness of an officer's actions. Compare *St. Hilaire v. City of Laconia,* 71 F.3d 20, 25 (1st Cir.1995) (whether or not police identified themselves *not* material where officer's qualified immunity claim rested on reasonable self-defense) and *Harrell v. Decatur County,* 41 F.3d 1494 (11th Cir.1995) (summary judgment proper on qualified immunity where plaintiff did not counter evidence that decedent was reaching beneath his seat), vacating 22 F.3d 1570 (11th Cir.1994), with *Ting v. United States,* 927 F.2d 1504, 1510 (9th Cir.1991) (whether or not plaintiff made sudden movement toward another room was in dispute and material to officers' qualified immunity claim of self-defense), and *Zuchel v. Spinharney,* 890 F.2d 273, 275 (10th Cir. 1989) (lunging at police officer).

At least in a case with no issues of material fact related to the immunity defense, *Roy v. Lewiston* illustrates the First Circuit's standard for summary judgment on qualified immunity grounds where a plaintiff claims excessive force. 42 F.3d at 695. In *Roy,* a section 1983 claimant alleged use of excessive force by police officers in subduing a man who lunged suddenly at them armed with two knives. In affirming the district court's grant of summary judgment, the First Circuit explained: "In our view, a jury could not find that his conduct was so deficient that no reasonable officer could have made the same choice...." 42 F.3d at 695. This standard comports both with the objective reasonableness test for excessive force (*Graham*) and the "plainly incompetent" gloss courts have given to the qualified immunity analysis (*Anderson*).

## ANALYSIS

■ In a sense, this case is not typical of those alleging use of excessive force by the police. At oral argument, the parties agreed with the court that if plaintiff had shown a gun during the encounter, or even if an officer in Richardson's position could reasonably have believed that plaintiff might possess a gun or have access to one in the truck behind whose door he dived, the *degree* of force used to apprehend him would have been entirely appropriate. *Cf. Roy,* 42 F.3d at 695 (degree of force an issue where drunk plaintiff bearing kitchen knives was subdued by gunfire). The question then is not whether Richardson's use of deadly force was excessive, but whether it was reasonable for an officer in Richardson's position to perceive plaintiff's actions as hostile rather than merely defensive. In other words, as plaintiff conceded at oral argument, if it was not unreasonable for Richardson to perceive that plaintiff's leap toward the truck posed a threat to the officers on the scene, then it was not unreasonable for Richardson to respond with deadly force.

■ In answering that question, the court acknowledges the rationale of the excessive force cases, if not their exact holdings. In tense, uncertain, and rapidly evolving situations, officers are insulated from judicial second-guessing. *Graham,* 490 U.S. at 396, 109 S.Ct. 1865; *Hegarty,* 53 F.3d at 1377. The court must ask whether no reasonable officer, placed in Richardson's situation, could have perceived the threat that he did—that plaintiff might emerge from behind the truck door with a weapon, or, for that matter, might shoot at Wagner from behind the cover of the door without ever emerging or making himself visible to Richardson. Denying ourselves the benefit of "20/20 hindsight," *see Graham,* 490 U.S. at 396, 109 S.Ct. 1865, we review Richardson's situation.

Richardson arrived at what appeared to be a routine stop. He took note that plaintiff was pacing and nervous and that something was wrong with the scene. He also directed Cregg to check plaintiff's identification. Within seconds, however, Richardson faced tense, uncertain, and rapidly evolving circumstances. He saw Hughes, whom he knew to be plaintiff's companion, spin and shove Wagner, draw a semi-automatic weapon, point it in the face of his fellow officer, and squeeze the weapon. He then saw Wagner retreating and Hughes pursuing him with his weapon drawn.

■ At that point, Richardson took aim and fired at Hughes, but, as he did so, he saw plaintiff out of the corner of his eye. It is undisputed that plaintiff ran and dove toward the door of the truck. Rather than

wait to see what happened next, Richardson fired two shots at the door and the plaintiff.[7]

Plaintiff contends that he was standing with his hands above his head in a position of surrender and that he was merely diving for cover.[8] Plaintiff's position prior to the dive, however, is not material; rather, what Richardson saw thereafter—a sudden movement from a position of surrender toward the vehicle—is critical.

There are at least two reasonable explanations for plaintiff's conduct. On the one hand, diving for cover is a perfectly reasonable reaction on the part of an innocent person caught in a firefight. On the other hand, a culpable individual might dive for a weapon to prevent capture, or, worse, to take the offensive against the police. Confronted with two possible explanations, and the need to make a split-second decision that, either way, would have potentially life-threatening consequences, Richardson could not know why plaintiff moved as he did. *See Hegarty*, 53 F.3d at 1379 n. 11 ("[O]mniscience is not the presumed mind set with which an objectively reasonable police officer approaches life-endangering situations."). This is particularly true where plaintiff's companion had just moved from a position of relative surrender to one that threatened the lives of the officers.

Richardson made his choice. The excessive force and qualified immunity cases discourage us from assessing what a reasonable officer could or could not believe beyond asking whether his conduct was plainly incompetent. *See Hunter*, 502 U.S. at 229, 112 S.Ct. 534; *Anderson*, 483 U.S. at 641, 107 S.Ct. 3034; *St. Hilaire*, 71 F.3d at 28; *Hegarty*, 53 F.3d at 1377. Under the circumstances, it was not.

Plaintiff further argues that he made no aggressive movements from behind the door

of the truck (e.g., rummaging in the truck, popping up with a weapon), and that no reasonable officer would fire without waiting for any such motions. Similarly, plaintiff also argues that no reasonable officer would fire at him without warning first. Although the court is sympathetic to plaintiff's plight and does not fault him for seeking cover, it cannot ask Richardson to wait while a potential threat becomes an actual one before defending himself or his fellow officers. From Richardson's vantage point, plaintiff could have fired several rounds in Wagner's direction, or, for that matter, Richardson's, without ever emerging from his position behind the door.

In *Jones v. City of Upper Arlington,* the Sixth Circuit addressed a situation almost identical to the one in this case. Jones was a passenger in a car pulled over after it had fled from a traffic accident. Officers fired on Jones after the *driver* of the vehicle jumped from the car firing a weapon, despite the fact that Jones, as instructed by the police, left his hands on the ceiling of the car. Solely on the basis that "at the time of the incident, [Jones] appeared to be [the gunman's] confederate," the Court concluded that the officers' response to the gun was reasonable. *Jones v. City of Upper Arlington,* No. 92–3154, 1993 WL 43933, at *3 (6th Cir. Feb.19, 1993).

One could argue that Richardson's response to Hughes' confederate, plaintiff, was less reasonable. After all, Jones was in a vehicle involved in a high-speed chase and plaintiff was merely involved in a routine stop. Even accepting this distinction, it is clear that Richardson was not plainly incompetent under the circumstances. *See Hunter,* 502 U.S. at 229, 112 S.Ct. 534; *see also Roy,* 42 F.3d at 695 ("[I]n close cases, a jury does not get to second-guess these life and

---

7. As noted, Richardson testified at his deposition that the reason he fired at the door was to "lay down cover" to let plaintiff "know [he] was there." His subjective reasons for doing so, however, are irrelevant, except to the extent that they shed light on what an objectively reasonable police officer might have done under the circumstances. *Graham,* 490 U.S. at 397, 109 S.Ct. 1865; *Alexis v. McDonald's Restaurants of Mass., Inc.,* 67 F.3d 341, 352 (1st Cir.1995).

8. The record is not clear exactly where plaintiff's hands were before he ran and dove. As it must in a summary judgment motion, the court allows plaintiff the inference that his hands were above his head in a position of surrender when Hughes pulled the gun and Richardson fired.

death decisions, ..., even though the situation could have been handled differently."). The standard, it must again be emphasized, is not mere negligence. Richardson is entitled to prevail unless no reasonable police officer could have believed that plaintiff posed a threat. To state the question, in the context of the life-threatening circumstances in which Richardson found himself, is practically to answer it. Richardson is therefore entitled to summary judgment.

*Cregg and Wagner.* According to the police depositions, neither Cregg nor Wagner shot plaintiff or directly participated in subduing him. At oral argument, both parties thus agreed that no reasonable jury could find that these two officers' conduct was objectively unreasonable. *See Roy,* 42 F.3d at 695. *Cf. Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553 (1st Cir.1989) (non-firing officers violated section 1983 by setting in motion actions resulting in constitutional injury). Cregg and Wagner, too, are therefore entitled to summary judgment.

### CONCLUSION

The Supreme Court has held that qualified immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The Court has thus repeatedly stressed the importance of resolving immunity questions at the earliest possible stage of litigation. *See, e.g., Hunter,* 502 U.S. at 227, 112 S.Ct. 534; *Malley,* 475 U.S. at 526, 106 S.Ct. at 1310. Because "a jury could not find the officers' conduct so deficient that no reasonable officer could have made the same choice," *see Roy,* 42 F.3d at 695, summary judgment shall enter on behalf of defendants Cregg, Richardson, and Wagner on plaintiff's section 1983 claim. In accordance with the parties' joint stipulation, judgment should also enter for the defendant officers and the defendant Town of Dracut on all of plaintiff's remaining claims.

**SO ORDERED.**