Maria M. NATAL, Plaintiff,

v.

CITY OF NEW BEDFORD, Rosemary S. Tierney, Richard Benoit, and Henry Turgeon, III, Defendants.

No. Civ.A. 97–12407–WGY.

United States District Court, D. Massachusetts.

Feb. 23, 1999.

Edward F. O'Brien, Falmouth, MA, for Maria M. Natal, plaintiff.

Kevin J. Finnerty, Fernandes & Finnerty, New Bedford, MA, for Rosemary S. Tierney, defendant.

Andrew B. Peppard, Peppard & Littman, Fall River, MA, for Richard Benoit, defendant.

Timothy M. Burke, Brian J. Rogal, Law Offices of Timothy M. Burke, Needham, for Henry Turgeon, III, defendant.

Joseph L. Tehan, Jr., Jonathan M. Silverstein, Kopelman & Paige, Boston, MA, George J. Leontire, City Solicitor, New Bedford, MA, for The City of New Bedford, defendant.

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

## I. INTRODUCTION

Maria M. Natal ("Natal") brings this action as the administratrix of the estate of her father, Carlos Adorno ("Adorno"), who was shot dead on February 11, 1996 by New Bedford Police Officer Henry Turgeon, III ("Turgeon") during an attempted arrest. Natal asserts causes of action against the City of New Bedford ("the City") under 42 U.S.C. § 1983 and the Massachusetts Tort Claims Act, Mass. Gen.L. ch. 258, § 2. Natal also asserts claims against Mayor Rosemary S. Tierney ("Tierney"), Chief of Police Richard Benoit

("Benoit"), and Turgeon under 42 U.S.C. § 1983 and the Massachusetts Wrongful Death Act, Mass.Gen.L. ch. 229, § 2. The defendants now move for summary judgment.

## II. FACTUAL BACKGROUND

Viewing the factual record most generously in Natal's favor, the following scenario emerges:

At about 10:30 p.m. on February 11, 1996, Turgeon and Officer August Santos ("Santos") observed two individuals carrying a case of beer on Acushnet Avenue in New Bedford. The individuals told Santos and Turgeon that they had purchased the beer from an apartment at 86 Beetle Street, which was Adorno's residence. Turgeon and Santos, along with Officer Shain Ramos ("Ramos"), designed an "undercover" plan by which Ramos would attempt to purchase five cans of beer from Adorno without identifying himself as a police officer. Turgeon and Santos were to stay behind while Ramos bought the beer.

When Ramos approached the apartment, the door was open, but chained, leaving an aperture of about seven inches through which Ramos could see into the apartment. Ramos handed Adorno money through the opening. Adorno then retreated into the apartment, and returned with a brown paper bag. Before Adorno handed the bag through the opening, Ramos identified himself as a police officer and ordered Adorno to open the door.

At this point, Turgeon climbed to the second floor of the building. He looked through the opening and saw Adorno holding a shot gun. Adorno ignored Ramos' orders to drop the gun. Turgeon eventually kicked the door open and drew his gun. Adorno was turning away and Turgeon did not know where he was pointing the shotgun. Nevertheless, Turgeon shot Adorno fatally in the stomach.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A "genuine" issue is one that "properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "material" fact is one that "might affect the outcome of the suit" under the applicable legal standard. *Id.* at 248, 106 S.Ct. 2505.

The burden is on the moving party to show the absence of a genuine issue of material fact. *See Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 15 (1st Cir.1986). If the movant sustains his or her burden, the nonmovant can only survive summary judgment if he or she proffers evidence supporting the existence of a genuine issue of material fact to be resolved at trial. *See Donovan v. Agnew*, 712 F.2d 1509, 1516 (1st Cir.1983).

## IV. DISCUSSION

### A. *Federal Civil Rights Claims*

#### 1. *Turgeon*

An excessive force claim in the context of an arrest invokes the protections of the Fourth Amendment, *see Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and should be analyzed under its "reasonableness" standard, *see id.* at 395, 109 S.Ct. 1865.

Turgeon seeks summary judgment on grounds that (1) his use of deadly force was reasonable, and (2) he is entitled to qualified immunity. While the first is a defense to liability and the second a de-

fense to suit, both inquiries entail essentially the same analysis. *See St. Hilaire v. City of Laconia,* 71 F.3d 20, 24 n. 2 (1st Cir.1995); *Roy v. Inhabitants of City of Lewiston,* 42 F.3d 691, 695 (1st Cir.1994); *Medeiros v. Dracut,* 21 F.Supp.2d 82, 87 (D.Mass.1998) (Karol, M.J.). If, however, this Court grants Turgeon's summary judgment motion on the issue of liability rather than qualified immunity, Natal's claims against the City, Tierney, and Benoit are moot. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (holding that municipal and supervisory liability are "quite beside the point" when no constitutional injury has occurred at the hands of the police officer). Accordingly, this Court first considers the issue of liability on the merits.

■ The "reasonableness" of Turgeon's use of deadly force "must be judged from the perspective of a reasonable officer on the scene, rather than with the ²⁰⁄₂₀ vision of hindsight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. The reasonableness question is an objective one; that is, the Court must consider whether Turgeon's actions were "objectively reasonable" in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. *See id.* at 397, 109 S.Ct. 1865. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865.

The First Circuit has interpreted *Graham* "to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases." *Roy,* 42 F.3d at 695; *accord Medeiros,* 21 F.Supp.2d at 86 (noting that "[b]oth the Supreme Court and

the First Circuit have afforded a comparatively generous standard of reasonableness to the police in cases where potential danger, emergency conditions, or other exigent circumstances are present."). Consequently, courts in this Circuit do not "second-guess" officers, even if, in retrospect, a situation could have been handled differently. *See St. Hilaire,* 71 F.3d at 28; *Roy,* 42 F.3d at 695; *Medeiros,* 21 F.Supp.2d at 87.

■ Turning to the events of February 11, 1996, it is undisputed that Adorno had a gun when Turgeon approached Adorno's apartment, that Ramos identified himself as a police officer, and that Adorno ignored Ramos' repeated warnings to drop the gun. According to Turgeon, he saw Adorno "fidgeting with the gun, attempting to do something with the gun, up near the trigger mechanism." Turgeon Aff. ¶ 19. Based on the small size of the landing and the lack of cover available, Turgeon concluded that it would be safer to force the door open and apprehend Adorno rather than retreat. *See id.* at ¶ 24. After several attempts, Turgeon kicked the door open, at which point he saw Adorno leveling the gun toward him and Ramos. Turgeon then drew his gun and fired one shot at Adorno in order to prevent Adorno from shooting him or Ramos. The total time elapsed between Turgeon's approach to Adorno's door and the fatal shot was less than one minute. *See id.* at ¶ 29.[1]

Viewing Turgeon's actions without the benefit of hindsight, his actions were objectively reasonable. In *St. Hilaire,* a police officer shot a suspect in his car after he saw the suspect's shoulder move, because the officer believed the suspect was reaching for a gun. *See St. Hilaire,* 885 F.Supp. 349, 353 (D.N.H.), *aff'd* 71 F.3d 20 (1st Cir.1995). The First Circuit affirmed the district court's grant of summary judgment for the officer, noting that "[t]he judgment Detective Gunter made in that

---

1. Turgeon's wound ballistics expert, Dr. Martin L. Fackler, concluded that Adorno's wound was "consistent with a shotgun held by Mr. Adorno being pointed in the direction of Officer Turgeon at the time he fired." Fackler Rep. at 1.

split second was at the very least reasonable, and it is not the role of the court to second-guess the decision." *See St. Hilaire,* 71 F.3d at 28.

In *Medeiros,* a police officer saw a suspect aim his gun at another officer. *See Medeiros,* 21 F.Supp.2d at 85. While drawing his own gun, the officer noticed the plaintiff, an accomplice of the suspect, run and dive behind a truck. *See id.* The officer fired two shots at the plaintiff who, it turned out, was not armed. *See id.* The court concluded that the officer's decision to shoot was objectively reasonable, noting that it could not ask an officer "to wait while a potential threat becomes an actual one before defending himself or his fellow officers." *Id.* at 88; *accord Roy,* 42 F.3d at 696 (holding that police officers acted reasonably when they shot a drunk suspect pointing two knives at the police).

Natal offers the reports of two experts in opposition to Turgeon's motion for summary judgment. Melvin L. Tucker ("Tucker"), an expert in law enforcement, stated in his report that Turgeon "could have taken a position of cover and removed himself from any threat from Adorno instead of proceeding with an effort to apprehend Adorno by kicking in the door." Tucker Rep. at 8. Tucker's report, however, does not create a genuine issue of material fact. In *Roy,* the plaintiff's expert was prepared to testify that the officers could have retreated in three different directions rather than shoot the plaintiff. *See Roy,* 42 F.3d at 694. The First Circuit affirmed the district court's grant of summary judgment for the officers, noting that "a jury does not automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently." *Id.* at 695.

Natal's second expert, Dr. Vincente DiMaio ("DiMaio"), concludes that "[t]he tra-

jectory of the bullet is consistent with the victim turning towards his left, away from the police officers, at the time he was shot." DiMaio Rep. at 2. DiMaio's report also fails to create a genuine issue of material fact. The permissible inference from DiMaio's report is only that Adorno was turned away from Turgeon when the bullet entered his body. DiMaio's report does not dispute Turgeon's statement that Adorno was facing him at the time Turgeon decided to fire. *See* Turgeon Aff. ¶ 25. Adorno could have turned his torso more than ninety degrees during the time it took Turgeon to fire his weapon. *See* Fackler Rep. at 2. Moreover, if Adorno was turning away from Turgeon at the time he was shot, it necessarily follows that Adorno was, at some point, facing the officers.

In *Maiorana,* a case brought on behalf of a suspect shot by police during an arrest, the plaintiff proffered an affidavit stating that the fatal bullet entered the decedent's armpit, thereby implying that the suspect had his arms raised to surrender when the police shot him. *See Maiorana v. MacDonald,* 596 F.2d 1072, 1081 (1st Cir.1979). The First Circuit concluded that this "shaky inference" did not contradict the officer's sworn testimony that he had not seen the suspect raise his arms to surrender when he fired his weapon. *Id.* Turgeon contends that Adorno was facing him and Ramos with the gun when Turgeon decided to shoot. Natal has offered no evidence to the contrary. Furthermore, this case "is clearly not the type of situation where the physical facts themselves create an issue, as, for instance, if [Adorno] had been shot in the back." *Id.*

No genuine issue of material fact remains to be resolved at trial with regard to Turgeon's liability under section 1983. Accordingly, this Court GRANTS Turgeon's motion for summary judgment on the section 1983 claim.[2]

---

2. Having already determined that Turgeon's decision to shoot Adorno was not unconstitutional, it is not necessary to consider whether

he is shielded from suit by the doctrine of qualified immunity. The Court pauses, however, to reiterate that the standard for quali-

### 2. *Tierney, Benoit, and the City*

Because this Court holds that Turgeon's use of deadly force did not violate Adorno's Fourth Amendment rights, it must also grant the summary judgment motions of Tierney, Benoit, and the City. *See City of Los Angeles*, 475 U.S. at 799, 106 S.Ct. 1571. "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *Id.; accord Carapellucci v. Town of Winchester*, 707 F.Supp. 611, 618 (D.Mass.1989) (Keeton, J.). Accordingly, this Court GRANTS the City's, Benoit's, and Tierney's motions for summary judgment.

### B. *Pendent State Law Claims*

Natal also brings claims under the Massachusetts Tort Claims Act, Mass.Gen.L. ch. 258, § 2, and the Massachusetts Wrongful Death Act, Mass.Gen.L. ch. 229, § 2. "[I]t is the settled rule in this Circuit that in a non-diversity case, where pendent state claims are joined with a federal cause of action and that federal cause of action is the subject of a successful summary judgment motion, the pendent state claims should be dismissed." *Cullen v. Mattaliano*, 690 F.Supp. 93, 99 (D.Mass.1988); *accord St. Hilaire*, 885 F.Supp. at 358 (dismissing plaintiff's state law claims after granting summary judgment to defendants on section 1983 claims). Accordingly, this

Court holds that it lacks jurisdiction to consider Natal's remaining claims. *See* 28 U.S.C. § 1367(c) (1998).

## V. CONCLUSION

For the foregoing reasons, this Court GRANTS the defendants' motions for summary judgment on Natal's federal civil rights claims and, lacking subject matter jurisdiction, remands her pendent state law claims to the Massachusetts Superior Court sitting in and for the County of Bristol.

fied immunity—"objective reasonableness"—is essentially the same as the standard for substantive liability. *See St. Hilaire*, 71 F.3d at 24 n. 2; *Roy*, 42 F.3d at 695; *Medeiros*, 21 F.Supp.2d at 87. Courts routinely draw on liability cases to decide questions of qualified immunity, and vice versa. *See, e.g., Medeiros*, 21 F.Supp.2d at 88. To the extent that they are different, it appears that qualified immunity offers "a wider band" of protection to police officers than the substantive liability analysis; that is, even conduct determined to violate constitutional rights could fall within the scope of qualified immunity. *Camilo-Robles v. Hoyos*, 151 F.3d 1, 8 n. 4 (1st Cir.1998).